**UNITED STATES of America**

v.

**Darrin CASPER, a/k/a Barry Jackson, Appellant.**

**No. 91–5227.**

United States Court of Appeals,
Third Circuit.

Argued Jan. 6, 1992.

Decided Feb. 11, 1992.

David A. Ruhnke (argued), Ruhnke & Barrett, West Orange, N.J. and Thomas R. Ashley, Ashley & Charles, Newark, N.J., for appellant.

Michael Chertoff, U.S. Atty., Edna B. Axelrod, and Eric L. Muller (argued), Office of the U.S. Atty., Newark, N.J., for appellee.

Before COWEN, NYGAARD, and WEIS, Circuit Judges.

## OPINION OF THE COURT

COWEN, Circuit Judge.

Darrin Casper challenges the judgment of conviction entered against him following a jury trial. At issue in this appeal is whether the circumstantial evidence presented by the government against Casper for violations of the Travel and Hobbs Acts was sufficient to support the guilty verdict rendered by the jury. In addition, Casper contends that a new trial is required because the government used its peremptory challenges to exclude minority jurors from the petit jury venire in violation of the Equal Protection Clause of the Fourteenth Amendment. We conclude that the evidence was insufficient to convict and will reverse.

## I.

On April 30, 1990, Casper and nine others were named in a nine-count indictment in the District of New Jersey. The indictment alleged a variety of RICO, Hobbs Act and Travel Act offenses. The allegations contained in the indictment centered around the door-to-door candy sales business run by codefendant Gerald Winters. Following a trial of nine of the ten defendants, which lasted over two months, Casper was acquitted of all but Counts Five and Six. Count Five alleged a conspiracy to violate the Hobbs Act, 18 U.S.C. § 1951 (1988). Count Six alleged a violation of the Travel Act, 18 U.S.C. § 1952 (1988).

The district court had jurisdiction over this matter pursuant to 18 U.S.C. § 3231. This court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). A district court's determination that a defendant has failed to make a prima facie showing of racial discrimination in violation of the Equal Protection Clause will be reversed only if that determination is clearly erroneous. *United States v. Grandison*, 885 F.2d 143, 146 (4th Cir. 1989). As an appellate court reviewing the sufficiency of the evidence presented at trial, we must uphold the verdict of the jury "if there is substantial evidence, taking the view most favorable to the government, to support it." *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Aguilar*, 843 F.2d 155, 157 (3d Cir.), *cert. denied*, 488 U.S. 924, 109 S.Ct. 305, 102 L.Ed.2d 324 (1988).

## II.

Casper contends that the government exercised its peremptory challenges against "minority" jurors in contravention of the Supreme Court's holding in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In *Batson* and its progeny, the Supreme Court set forth the factors necessary to make a prima facie showing of racial discrimination. First, the defendant must show that the challenged jurors were members of a cognizable racial or ethnic group.[1] *United States v. DiPasquale*, 864 F.2d 271, 277 (3d Cir.1988), *cert. denied*, 492 U.S. 906, 109 S.Ct. 3216, 106 L.Ed.2d 566 (1989). Then the defendant must show that the relevant facts and circumstances of the case raise an inference that the prosecution used its peremptory challenges to exclude members of the venire from the petit jury on account of their race. *Batson*, 476 U.S. at 96, 106 S.Ct. at 1723. Relevant circumstances include "(1) the fact that peremptory challenges permit a prosecutor predisposed to discriminate to do so; (2) any other pattern of discriminatory conduct; and (3) any prosecutorial statements." *United States v. Clemons*, 843 F.2d 741, 746 (3d Cir.), *cert. denied*, 488 U.S. 835, 109 S.Ct. 97, 102 L.Ed.2d 73 (1988).[2] If the defendant makes out a prima facie case, the burden shifts to the prosecution to come forward with some neutral explanation for challenging black members of the venire. *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723.

A race neutral explanation means an explanation based on something other than the race of the juror. *Hernandez v. New York*, — U.S. —, 111 S.Ct. 1859, 1966, 114 L.Ed.2d 395 (1991) (plurality). At this stage the issue focuses on the facial validity of the prosecutor's explanation. Thus unless a discriminatory intent is inherent in the explanation, the reason offered will be deemed race neutral. *Id.*

The *Batson* Court stated that explanations must be "clear and reasonably specific." 476 U.S. at 98 & n. 20, 106 S.Ct. at 1724 & n. 20. Explanations based on a prosecutor's mere "good faith" or "intuition" do not suffice. *Id.; See United States v. Horsley*, 864 F.2d 1543, 1546 (11th Cir.1989) (per curiam) ("I just got a feeling about him" is insufficient). The government's explanation, however, need not rise to the level of just cause, *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723, nor need it be "quantifiable" to be race neutral. *See United States v. Lance*, 853 F.2d 1177, 1181 (5th Cir.1988). A district court may also choose to accept the prosecution's explanation as race neutral where it rests upon the prosecution's evaluation of a venireperson's credibility and demeanor. *See*

---

1. *Batson's* requirement that there be racial identity between the defendant and the jurors subject to the peremptory challenge was eliminated by the Supreme Court in *Powers v. Ohio*, — U.S. —, 111 S.Ct. 1364, 1373–74, 113 L.Ed.2d 411 (1991). *Powers* applies retroactively to this case, which was on direct appeal at the time *Powers* was decided. *See Holland v. Illinois*, 493 U.S. 474, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990).

2. While *Batson* involved the application of the Fourteenth Amendment's Equal Protection Clause to state prosecutions, the same limitations are imposed on federal prosecutors by the Fifth Amendment. *United States v. Lane*, 866 F.2d 103, 104 n. 1 (4th Cir.1989); *United States v. Forbes*, 816 F.2d 1006, 1009 n. 6 (5th Cir. 1987).

*id.* (prosecutor's observation of eye contact and demeanor was significant and constituted neutral explanation of peremptory exclusion); *United States v. Hughes,* 911 F.2d 113, 114–15 (8th Cir.1990) (challenges based on education, sarcastic responses, appearance, and background, were reasonably neutral).

■ The trial judge plays "a pivotal role" in determining whether a prima facie case has been established. *Clemons,* 843 F.2d at 745. *See also Batson,* 476 U.S. at 97, 98 n. 21, 99 n. 22, 106 S.Ct. at 1723, 1724 nn. 21, 22; *United States v. Forbes,* 816 F.2d 1006, 1010 (5th Cir.1987); *United States v. Allen,* 814 F.2d 977, 978 (4th Cir.1987); *United States v. Mathews,* 803 F.2d 325, 330 (7th Cir.1986), *rev'd on other grounds,* 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988). A trial judge's finding as to intentional discrimination or lack thereof is a finding of fact. *Batson,* 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21. We review for clear error. *United States v. Clemons,* 892 F.2d 1153, 1157 (3d Cir. 1989).

There will seldom be much direct evidence of discriminatory intent. Such invidious intent does not rear its ugly head for everyone to see; instead it hides behind the cloak of pretext. Consequently, the trial judge's finding of discrimination largely turns on evaluation of the credibility and demeanor of the attorney who exercises the challenge. *Hernandez,* 111 S.Ct. at 1870. This evaluation lies "peculiarly within a trial judge's province." *Id.* Because trial judges' experiences, instincts, and first-hand observations are so crucial, a reviewing court ordinarily should afford their findings "great deference." *Id.* at 1869.

■ Here the district court found that the defendants have failed to satisfy even the threshold requirement of showing a prima facie case of discrimination. This notwithstanding, the prosecutor placed on the record his race neutral reasons as to each black venireperson excluded. First, the prosecution excluded one venireperson because he expressed a preconceived opinion as to the legality of tape recording

conversations without the knowledge of the speaker. *See United States v. Roberts,* 913 F.2d 211, 215 (5th Cir.1990) (juror's preconceived notions of the legality of tape recordings even though he later changed his mind is a race neutral reason). Second, it excluded two venirepersons because it considered their responses in the voir dire evasive and inarticulate. *See United States v. Ruiz,* 894 F.2d 501, 506 (2d Cir. 1990) (juror's inarticulateness is a race neutral reason). Third, it excluded a venireperson who had hearing problems because it planned to introduce tape recording evidence during the trial. *See United States v. Dawn,* 897 F.2d 1444, 1447 (8th Cir.1990) (juror's vision and health problems are race neutral reasons); *United States v. Alston,* 895 F.2d 1362, 1367 (11th Cir.1990) (hearing problems). Finally, the prosecution excluded another venireperson because she was a relative of a local politician who had recently been unsuccessfully prosecuted for extortion. *See United States v. Bennett,* 928 F.2d 1548 (11th Cir.1991) (familial association with someone convicted of a crime is a race neutral reason).

For each of the government's explanations, the evidence fully supports the district court's finding of no discriminatory intent. That a defendant can point to facts consistent with a prima facie case is of no importance when we are reviewing a district court's findings under the "clearly erroneous" standard. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). The prosecution provided valid reasons for all of the challenges made to black jurors and the district court, having the opportunity to gauge the prosecutor's credibility in defending his actions, chose to credit those explanations. We hold that the district court did not clearly err.

### III.

Counts Five and Six were based on the same incident: the unsuccessful attempt, in Cypress, Texas, to burn an unoccupied van

owned by Anthony Spatola. At trial, the government contended that the attempt to burn the van was meant to punish Spatola for competing with the Winters organization in the sale of candy in the Houston area and to prevent Spatola from continuing such competition with Winters. Because the resolution of Casper's allegation as to the insufficiency of the evidence turns on the particular facts of this case and the evidence presented at trial, we set forth in some detail the events leading up to and concerning the attempted burning of Spatola's van.

Anthony Spatola had been involved in the door-to-door candy sales business on and off for a number of years. He had worked for Gerald Winters in both Los Angeles and Houston supervising and directing the door-to-door sales activities of teenagers employed by the Winters organization. Spatola left the employ of the Winters organization in 1986 and went to work for a candy company in Houston called United Teens as a crew manager and consultant to the distributor. In connection with his candy business, Spatola purchased a 1977 Dodge van. Evidence at trial established that in 1987, the Winters organization was also selling candy door-to-door in Houston.

In January, February and June of 1987, in the course of his employment with United Teens, Spatola encountered a number of Winters organization employees who recognized Spatola as a former member of their ranks. Sometime in 1987, Spatola began receiving threatening phone calls telling him he should not be in the candy business. One of the calls Spatola received was from a man named Kevin Miller who asked Spatola if he was planning, in his new job, to hire people away from the Winters candy operation. When Spatola replied that he was not, Miller stated, "That's good, I didn't think you would do that." App. at 2998–99. There was no suggestion at trial that any of the threatening phone calls were made by Darrin Casper or that he was aware these calls had been made.

From June 14 to June 18, 1987, a three-day seminar was held in Houston for employees of the Winters organization. Ap-proximately 200 people from all over the country attended the seminar in Houston. Darrin Casper, as an employee of the Winters group, was among those who attended the seminar. Casper is black. Testimony revealed that "quite a number" of black people attended the seminar. App. at 2909–10.

At 7:30 a.m. on June 19, 1987, Spatola discovered that the driver's side window of his Dodge van, parked in his driveway, had been broken. On the floor inside the van Spatola found an upside-down can of Sterno. Around the spot where the Sterno can was found there was a "small burn area" on the van's floor carpeting.

On the day prior to Spatola's discovery, William Fenwick, one of Spatola's next-door neighbors, saw two cars he did not recognize in the vicinity of the Spatola home. One of the cars "looked to be a Lincoln Continental" and the other Fenwick thought was a Chevrolet of some sort. App. at 2946. Standing outside one of the cars was a white man Fenwick described as tall, heavy-set and balding. That description generally matched the characteristics of Gerald Winters, as well as scores of other white men in the United States. Fenwick also observed three black men sitting in the Chevrolet. The white man gestured in the direction of Fenwick or Spatola's house.

Later in the afternoon, Fenwick saw the Lincoln pull into Spatola's driveway and a black man whom Fenwick never identified proceeded toward the Spatola home. When the man realized he was being observed by Fenwick, he got back into the Lincoln and left. Later that day, Fenwick noticed the same Chevrolet parked one block away on a street parallel to the street on which Fenwick and Spatola's homes were located. A black man, again never identified by Fenwick, was standing outside of the Chevrolet observing the back of Spatola's home.

Between 1:00 and 2:00 a.m. on June 19, 1987, Fenwick's son-in-law, Matthew Stevenson, who was spending the night at Fenwick's home, stepped outside to smoke a cigarette. He saw a late model Lincoln with two black men inside pull into Spato-

la's driveway. A passenger of the car got out and walked to Spatola's van, rapidly returned to the car, and left. Stevenson, like Fenwick, was unable to identify either of the men he saw as Casper or any of the defendants on trial.

Spatola investigated and discovered that Winters was staying at the Sheraton Hotel near the Houston airport and had rented a Lincoln Town Car from Budget Rent-a-Car. He also learned that Casper occupied an additional room rented by Winters and that the account for that room had been closed at 2:41 a.m. on June 19, 1987. Spatola phoned the Budget office and warned the clerk to watch out for the return of the car Winters had rented.

At 12:47 p.m. on June 19, approximately twelve hours after the attempted arson observed by Peterson, the Lincoln rented by Winters was returned. Both the driver and passenger were black men. Patricia Norris, a Budget employee, identified Darrin Casper as the passenger of the Lincoln upon its return.[3] Spatola later came to the Budget rental facility and, with the cooperation of Budget employees, examined the trunk of the Lincoln. In the trunk Spatola discovered candy, the lid of the Sterno can which Spatola had found in his van, a full can of Sterno, gloves, and screwdrivers.

Testimony was presented at trial to show that Winters was angry that Spatola was competing with him in the candy business. In 1987, Winters purportedly told two of his employees that in order to take care of Spatola "[w]e can just blow his van up." App. at 2876. Thereafter, two of Winters' employees located Spatola's home and wrote down the address.[4]

Another witness testified that in 1987 she heard a Winters employee, either Stephen Koch or Ron Crowe, state that Spatola owed Winters "a lot of money" and that they were "going to burn [Spatola's] van up" to take care of that problem. App. at 2921, 2933. No witness testified that Casper was seen at or near the Spatola home

at any time nor was there testimony connecting Casper to any plan by Winters to threaten or harm Spatola or his property. There was no evidence that Casper was even aware such a plan existed.

## IV.

In reviewing the sufficiency of the evidence to support Casper's conviction, we are mindful of the Supreme Court's holding that an appellate court must sustain the verdict of a jury if there is substantial evidence, viewed in the light most favorable to the Government, to uphold the jury's decision. *Burks v. United States*, 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978); *Glasser*, 315 U.S. at 80, 62 S.Ct. at 469. In determining whether evidence is sufficient, we will not weigh evidence or determine the credibility of witnesses. *Glasser*, 315 U.S. at 80, 62 S.Ct. at 469; *United States v. Inigo*, 925 F.2d 641, 649 (3d Cir.1991). Appellate reversal on the grounds of insufficient evidence should be confined to cases where the failure of the prosecution is clear. *Burks*, 437 U.S. at 17, 98 S.Ct. at 2150; *Government of the Virgin Islands v. Brathwaite*, 782 F.2d 399, 404 (3d Cir.1986); *United States v. Leon*, 739 F.2d 885, 891 (3d Cir.1984). The evidence need not be inconsistent with every conclusion save that of guilt, so long as it establishes a case from which a jury could find the defendant guilty beyond a reasonable doubt. *United States v. Vastola*, 899 F.2d 211, 226 (3d Cir.), *vacated on other grounds*, —— U.S. ——, 110 S.Ct. 3233, 111 L.Ed.2d 744 (1990); *United States v. Sandini*, 888 F.2d 300, 311 (3d Cir.1989), *cert. denied*, 494 U.S. 1089, 110 S.Ct. 1831, 108 L.Ed.2d 959 (1990); *United States v. Cooper*, 567 F.2d 252, 254 (3d Cir.1977). A defendant challenging the sufficiency of the evidence bears a heavy burden. *Vastola*, 899 F.2d at 226. We believe Casper has successfully carried that burden.

---

**3.** Norris identified the driver as Anthony Allen, who was also charged with Casper and Winters in the Spatola extortion and was acquitted by the jury of all charges.

**4.** One of these employees testified that he believed a lawsuit was being filed against Spatola by Winters and that Spatola's address was needed to serve papers on him.

■ The government's evidence against Casper was entirely circumstantial. While drawing inferences from established facts is an acceptable method of proof when direct evidence is not available, the inferences drawn must have a logical and convincing connection to the facts established. *United States v. McNeill*, 887 F.2d 448, 450 (3d Cir.1989), *cert. denied*, 493 U.S. 1087, 110 S.Ct. 1152, 107 L.Ed.2d 1055 (1990); *United States v. Bycer*, 593 F.2d 549, 551 (3d Cir.1979). The fact that evidence is circumstantial does not mean it is less probative than direct evidence. *Bycer*, 593 F.2d at 551. However, where the government's evidence of defendant's guilt rests only upon a chain of inferences and the defendant contends that the evidence is insufficient to support the verdict, we must determine whether the "proved facts logically support the inference" of guilt. *Id.* In the present case, even having drawn all reasonable inferences from the evidence presented in the government's favor, we do not believe, as a matter of law, that the proved facts logically support the inference of Casper's guilt on Counts Five and Six.

The government would have us hold that Casper's presence as a passenger in the Lincoln Town Car returned to Budget approximately twelve hours after the attempt to burn Spatola's van is sufficient proof from which a jury could infer that he was one of the participants in that act. No witness identified Casper as one of the men seen in the vicinity of Spatola's home or van.[5] No witness testified that Casper was aware that Winters was interested in "getting even" with Spatola. Moreover, although evidence connecting the Lincoln to the arson attempt was found in the car's trunk, there was no evidence to show that Casper was aware of what was in the trunk of the Lincoln in which he was a passenger. In short, except for the fact that Casper

was staying in a hotel room rented by Winters, there is no evidence that can be said to lead to the "logical" inference that he was involved in the Spatola extortion. Accordingly, we will reverse his conviction on Counts Five and Six.[6]

## V.

In sum, we hold that the district court's determination that Casper failed to make a prima facie showing of racial discrimination in violation of the Equal Protection Clause was not clearly erroneous. However, we hold that the evidence presented by the government in support of Casper's guilt of Counts Five and Six was legally insufficient to support the jury's verdict. We will reverse the district court's order entering a judgment of conviction and sentence on Counts Five and Six of the indictment. The matter will be remanded to the district court with directions to enter an order dismissing the indictment against Casper.

---

**5.** The government also apparently believes that because some of the men seen near Spatola's home were black, the fact that Casper is black creates an inference that Casper was one of the men involved. We do not find Casper's race probative of anything. The evidence demonstrated that numerous black men were attending the seminar sponsored by the Winters orga-

nization and we are confident that a great many black men live in the Houston area.

**6.** Having determined the evidence was insufficient to support the jury's verdict, we do not reach Casper's allegation that the district court erred in its instruction to the jury regarding the evaluation of eyewitness identification testimony.