**UNITED STATES of America,**

v.

**Stefan A. BRODIE, Don B. Brodie, James E. Sabzali, Bro–Tech Corp. d/b/a "the Purolite Company".**

**No. CRIM.A.00–629.**

United States District Court, E.D. Pennsylvania.

May 31, 2002.

Gregory B. Craig, Williams and Connolly, Washington, DC, for defendants.

Joseph G. Poluka, U.S. Attorney's Office, Philadelphia, PA, for plaintiff.

MEMORANDUM AND ORDER

MCLAUGHLIN, District Judge.

The Court decides here defendant Stefan Brodie's motion for judgment of acquittal made after the close of the government's case. The Court reserved on the motion and the jury convicted the defendant of conspiracy to violate the Trading With the Enemy Act ("TWEA") and the Cuban Assets Control Regulations ("CACRs"). The alleged conspiracy involved sales to Cuba of ion exchange resins by Bro–Tech Corporation ("Bro–Tech"), of which the defendant is 50% owner and Chief Executive Officer. The Court will grant the motion because there was insufficient evidence from which a jury could conclude that the defendant knowingly and willfully entered into the charged conspiracy.

I. *Overview of the Alleged Conspiracy*

Bro–Tech, which does business as the Purolite Company, is a Delaware corporation with headquarters in Bala Cynwyd, Pennsylvania; it manufactures and sells ion exchange resins, which are used in water purification. Bro–Tech is owned in equal portions by Stefan Brodie, its president and CEO, and his brother, defendant Don Brodie, its executive vice president.[1] Bro–Tech has sales offices located around the world, including one in Canada. The Canadian office is a division of Bro–Tech. Defendant James Sabzali served as the Canadian Sales Manager for Bro–Tech, resident in the Canadian office, and then as the North American Director of Marketing, resident in Bala Cynwyd.

Bro–Tech Limited is a U.K. corporation, owned in thirds by Stefan Brodie, Don Brodie, and Bro–Tech. Bro–Tech Limited, in turn, is a ninety-five percent owner of Purolite International Limited ("Purolite International"), also a U.K. corporation. Purolite International has a manufacturing facility that produces ion exchange resins, located in Pontyclun, South Wales.

Count One of the seventy-seven-count indictment charges that from April 1993 to May 2000, Stefan Brodie, Don Brodie, James Sabzali, and Bro–Tech knowingly and willfully conspired to violate TWEA and the CACRs by engaging in transactions involving Cuba. Overt acts were alleged to have begun on or about June 21, 1994, and to have ended on or about July 31, 1999. Stefan Brodie is not charged in any other counts of the indictment. The other three defendants are charged in all counts. Thirty-five counts charge them with sales to Cuba from 1994 to 1996. Twenty-four counts charge them with sales to Cuba from 1997 to 1999. Sixteen counts charge them with authorizing or reimbursing payments of expenses associated with Cuban travel.

The government and the defendant agree that a reasonable jury could find that Bro–Tech made the following sales to Cuba through intermediaries. Tr. of Oral Arg. at 2–3. The Canadian sales office arranged each sale.

1. From 1992 to 1993, four sales were made by Bro–Tech through a Canadian company. The sales were booked at Bro–Tech, and the product was manufactured by and shipped from Purolite International. These sales were not charged in the indictment.

2. From 1994 to 1996, thirty-five sales were made by Bro–Tech through intermediaries in Canada and Mexico. At times the product sold was manufactured by and shipped from Bro–Tech, and at other times Purolite International.

---

1. When the Court refers to the defendant or Mr. Brodie in this memorandum, it is referring to Stefan Brodie. When referring to Don Brodie, the Court will use his full name.

3. From 1997 to 1999, twenty-four sales were made by Bro–Tech through the intermediary San Marco. All sales in this period were booked at Purolite International, and the product was manufactured by and shipped from Purolite International.

Bro–Tech employees James Sabzali and Claude Gauthier, a Canadian citizen working as a salesman in the Canadian office, were reimbursed for their business-related travel to Cuba. The expense reports and approvals for this travel were processed in Bala Cynwyd.

Each of the defendants presented evidence during the trial. The jury convicted all of the defendants of conspiracy. Don Brodie, James Sabzali, and Bro–Tech were all acquitted of the counts involving the 1997–1999 sales, four 1996 sales, and three of the sixteen counts involving expense reimbursements. At least two defendants were convicted of each of the other forty-four counts.

## II. *Legal Principles*

The defendant moved for judgment of acquittal, pursuant to Fed.R.Crim.P. 29(a), at the close of the government's case. The Court reserved decision on the motion. It must, therefore, "decide the motion on the basis of the evidence at the time the ruling was reserved." Fed.R.Crim.P. 29(b).

■ In deciding a motion for judgment of acquittal, the Court must determine whether, "upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *United States v. Phifer*, 400 F.Supp. 719, 724 (E.D.Pa.1975) (citation omitted), *aff'd*, 532 F.2d 748 (3d Cir.1976). A claim of insufficiency of the evidence places a heavy burden on a defendant. *See United States v.*

*Dent*, 149 F.3d 180, 187 (3d Cir.1998) (citation omitted); *United States v. Hitchens*, No. 00–CR–654–2, 2001 WL 1257167, at *1 (E.D.Pa. Oct.19, 2001). The Court must view the evidence in the light most favorable to the government, and must sustain the verdict if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Dent*, 149 F.3d at 187 (citation omitted).

There are special evidentiary concerns in conspiracy cases. Because of the "looseness and pliability" of the conspiracy doctrine, courts have been instructed to be mindful of the doctrine's "inherent dangers." *Krulewitch v. United States*, 336 U.S. 440, 449, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (Jackson, J., concurring). The Third Circuit has recognized that there is a tendency in conspiracy cases for finders-of-fact to believe a defendant "must have been involved in a conspiracy, once evidence has been presented of some questionable acts . . . ." *United States v. Samuels*, 741 F.2d 570, 574–75 (3d Cir.1984).

■ The Court recognizes that "[t]he sufficiency of the [circumstantial] evidence in a conspiracy prosecution requires close scrutiny." *United States v. Coleman*, 811 F.2d 804, 807 (3d Cir.1987). The existence of a conspiracy can be inferred "from a reasonable and logical inference, that the activities of the participants . . . could not have been carried on except as the result of a preconceived scheme or common understanding." *United States v. Kapp*, 781 F.2d 1008, 1010 (3d Cir.1986) (citation omitted). But "conspiracy cannot be proven . . . by piling inference upon inference . . . ." *Coleman*, 811 F.2d at 808 (internal quotation omitted). Individual guilt must be proven beyond a reasonable doubt, and slight evidence connecting a defendant to a conspiracy is insufficient. *Coleman*, 811 F.2d at 808; *Samuels*, 741 F.2d at 575.

**412**

■ When knowledge is one of the essential elements of an offense, as it is here, it must be proven as to all co-conspirators. *See United States v. Molt*, 615 F.2d 141, 146 (3d Cir.1980); *see also United States v. Wexler*, 838 F.2d 88, 92 (3d Cir.1988). Thus, the government had the burden of proving that Stefan Brodie, with an understanding of the unlawful nature of the conspiracy, intentionally engaged, advised or assisted in the conspiracy for the purpose of furthering its illegal undertaking.

■■ Drawing inferences from established facts is an acceptable method of proof in the absence of direct evidence, but only if there is a logical and convincing connection between the facts established and the conclusion inferred. *See United States v. Casper*, 956 F.2d 416, 422 (3d Cir.1992); *United States v. McNeill*, 887 F.2d 448, 450 (3d Cir.1989). When evidence of a defendant's guilt is based only on a chain of inferences, a court must determine if the "proved facts logically support the inference of guilt." *Casper*, 956 F.2d at 422 (internal quotation omitted).

### III. *Evidence Relating to Stefan Brodie*

Very little of the evidence presented by the government during the six days of its case-in-chief related to the defendant. There was no direct evidence of his involvement in any of the sales or reimbursements of expenses alleged in the indictment. Following is a description of all the evidence that related to the defendant.

#### A. *1992–1993*

The most substantial evidence involving Stefan Brodie came from two witnesses, Stephen Coulter, a partner at Deloitte & Touche, LLP ("Deloitte"), and Edward Grossman, Bro–Tech's Director of Finance. I describe their testimony in de-tail. It primarily involved 1993, but in one important regard, 1992.

In early 1993, Deloitte conducted an audit of Bro–Tech's financial statements for the 1992 fiscal year. Tr. at 86–89; Gov't Ex. 3. During the audit, Deloitte identified a 1992 sale to a Canadian company named Galax. Tr. at 91–93. The sale had been booked by Bro–Tech in the United States, and the product had been shipped to Cuba from Purolite International in the United Kingdom. Tr. at 500, 501. Galax is a specially designated national ("SDN") under the CACRs, *i.e.*, a company subject to the American ban on trading with Cuba. Tr. at 79; Gov't Ex. 4.

Mr. Coulter discussed the Galax transaction with both Mr. Brodie and Mr. Grossman. Tr. at 92–94. Mr. Coulter requested that Bro–Tech provide a legal opinion regarding the legal ramifications of the transaction. Tr. at 101. Mr. Brodie thought that Mr. Coulter was overreacting "because it was a single transaction performed by a salesman that was new to the company . . . ." Tr. at 101. The salesman for this transaction was Mr. Sabzali. Tr. at 507. Mr. Brodie did not want to incur the cost of a legal opinion, but he obtained one anyway. Tr. at 102.

After discussing the legal opinion by telephone with Bro–Tech's outside counsel, an attorney from Morgan Lewis & Bockius, Tr. at 102, Mr. Coulter sent a letter to the directors of Bro–Tech which included a "characterization of the legal opinion that [Mr. Coulter had] received from the company's counsel." Tr. at 106. In summarizing the legal opinion, the letter stated that "since the sale was unintentional, the likelihood of fines and penalties being assessed is remote in this particular case." Gov't Ex. 4. As a result, Deloitte issued an "unqualified" or "clean" audit opinion for

Bro–Tech.[2] Tr. at 137.

At some point during the audit, "there was a suggestion that the [Galax] sale [that was] recorded in Bro–Tech['s] books be transferred to Bro–Tech Limited's [the parent corporation of Purolite International Limited] books." Tr. at 107. Mr. Coulter did not know who made the proposal to transfer the transaction to Bro–Tech Limited. Tr. at 120. Mr. Coulter believed that this suggestion would require a legal opinion because the "transaction was initially recorded in Bro–Tech Corporation's books," and because Deloitte "would not know the legal implications" of transferring the sale to Bro–Tech Limited. Tr. at 107. Mr. Coulter did not remember anything further happening with the suggestion to transfer the Galax transaction to Bro–Tech Limited. *Id.* On March 31, 1993, in accordance with Mr. Grossman's instructions, the Galax sale was transferred to the books of Bro–Tech Limited in the United Kingdom. Gov't Ex. 10; Tr. at 506. Mr. Brodie participated with Mr. Grossman in the decision to rebook the sale. Tr. at 506.

In response to the Deloitte audit, the defendant issued a memorandum that featured largely in the government's case. I quote it here in full.

April 7, 1993

TO:   ALL SALES OFFICES
FROM: Steve Brodie
CC:   Don Brodie/Ed Grossman

It has come to our attention, during the 1992 audit, that a sale was made to the Canadian Company, Galax. The Galax credit was checked in our Philadelphia office, and approved. Subsequent to the approval of the order, our shipping department in the UK was ordered to drop-ship this order to Cuba.

While it is proper to ship this order from the UK in terms of UK law, it is contrary to USA policy and law to ship material of any kind to the island nation of Cuba in violation of the U.S. embargo. Brotech Corporation is a U.S. Corporate citizen, and as such, has no intention of violating U.S. policy, now or in the future.

No shipment or Purolite merchandise is to be shipped to, redirected to, or trans-shipped to Cuba. Any requests to do so are to be reported to Don or me.

/s/
Steve Brodie

Gov't Ex. 11.

On the face of the memo someone stamped the word "FAXED" and made a handwritten notation indicating that it had been faxed on April 7, 1993, at 2:30 p.m. The handwritten notation indicated that the memo had been faxed "To: All sales offices & Henri & Jack Evans & Don & Ed Grossman." Mr. Grossman testified that, as indicated in the handwritten notation, he had received a copy of the memo. Tr. at 503. Mr. Brodie's secretary, Harriet Goettl, hand-delivered a copy of the memo to Mr. Grossman. Mr. Craig Gentile, a salesman located in the Southwest, testified that he did not receive the April 1993 memorandum from Mr. Brodie. Tr. at 154.

After issuing the April 1993 memo, the defendant told Mr. Grossman that he understood that it was lawful for entities in the United Kingdom to ship product to

---

**2.** Mr. Coulter testified that in September 1993 Bro–Tech informed Deloitte that it was "switching" to Coopers & Lybrand, but he never gave a reason for the switch. Tr. 109. The government argued that Deloitte was fired because they found the Galax transaction. The defendant argued that the switch occurred because the audit was late and because of a billing dispute. There was evidence to support the defendant's argument.

Deloitte issued the audit report in July 1993, which Grossman considered late. Tr. at 561. Mr. Brodie was upset that the audit had not been completed in a timely manner and notified Mr. Coulter of that fact. Tr. at 138. There was also a dispute between Bro–Tech and Deloitte regarding the proper fee for the audit. Tr. at 560. There was absolutely no support for the conclusion the government urges.

Cuba and, at some point, Mr. Grossman recalls learning that the United Kingdom did not observe an embargo on Cuba. Tr. at 533.

I will set out verbatim certain critical testimony of Mr. Grossman. On direct, he testified as follows:

Q Were you aware of the Galax sale before the Deloitte & Touche audit?

A I don't know if it was the specific sale that they found, but I was aware of a sale to a Galax Company, yes.

Q And how do you know that—or how were you aware of it? Excuse me.

A Yes. During the year, in 1992 at some point, Steve Brodie called me into his office and indicated that there had been an invoice, this Galax, and that it had a reference to Cuba on there and that I should instruct the customer service department, the billing department, to make certain that they don't include any reference to Cuba in any future invoices on the face of the invoice.

Q And that was in 1992?

A I believe so.

Q Did you give such an instruction to the billing department?

A Yes, I did.

Tr. at 501.

On cross, Mr. Grossman testified as follows:

Q Now, you understood at that time that it was lawful to ship product to Cuba from the United Kingdom, did you not?

A I understood, it was explained to me at some point in time that they did not have the same prohibition in the United Kingdom as we have in the United States.

Q And Steve Brodie told you in 1993 that he understood that it was lawful for entities in the United Kingdom to ship product to Cuba, correct?

A Yes.

Q Now, in light of that decision, your understanding of what both Bro–Tech's finance department and Bro–Tech in the United States should be doing generally was that there should not be any future transactions involving Bro–Tech in the U.S. that involved the sale of product to Cuba, correct?

A Correct.

Q And Steve Brodie told you as part of that decision that future invoices coming out of Bro–Tech should not reflect sales to Cuba, correct?

A Correct.

Q And that was because future sales were supposed to go out of Purolite International in the United Kingdom, correct?

A This is after—you're talking about after the Deloitte & Touche–

Q After the Deloitte & Touche audit.

A Correct.

Q So your mission, as you understood it going forward from 1993, was to ensure that your finance department was not causing transactions to be booked out of the United States that involved the sale of product to Cuba?

A My understanding was that was not supposed to happen. It was Steve and Don Brodie's company, so it wasn't my decision as to—you know, to accept orders and to conduct commerce with Cuba, so my understanding is that that wasn't going to happen and that any commerce with

Cuba would be transacted through Purolite International, Limited.

Q  Fair enough. And the directive at that time—well, strike that question. You didn't receive any instruction at that time to delete or alter or destroy any records that related to Cuba in 1993, did you?

A  That's correct.

Q  And you didn't give any such instructions to anyone within the finance department; correct?

A  That's correct.

Q  So for the 1992 transactions that had happened with Galax, the documents that related to those remained within the finance department of Bro–Tech; correct?

A  Correct.

Tr. at 533–534.

Mr. Grossman was not aware of any sales to Cuba through Bro–Tech in the United States after the implementation of this policy. He assumed that all sales to Cuba were being conducted through Purolite International. Because Purolite International was a separate entity with its own finance department, Mr. Grossman would not have been aware of any sales to Cuba from Purolite International. Tr. at 508, 535.

Mr. Grossman took steps to ensure that the cost of any expenses associated with travel to Cuba would be borne by Purolite International. Tr. at 537. Mr. Grossman directed that any costs associated with Mr. Sabzali's or Mr. Gauthier's travel to Cuba should be segregated from their other expenses and that Purolite International should be billed for these expenses. Tr. at 537. Mr. Grossman believed that assessing the expenses to Purolite International was appropriate because Purolite International would be booking revenue from sales to Cuba. Tr. at 539–540. There was no

evidence that this procedure was discussed with Mr. Brodie or designed or approved by anyone at Bro–Tech other than Mr. Grossman.

Mr. Craig Gentile, a salesman for Bro–Tech, testified on direct that in the fall of 1991, or the spring of 1992, James Sabzali gave a presentation during which he mentioned business in Cuba. The defendant "jumped up" and said something to Mr. Sabzali who replied: "[W]ell, I mean our friends in the Caribbean." Tr. at 149. On cross, Mr. Gentile conceded that he told the grand jury this incident had occurred in 1993.

In its closing argument to the jury, the government stated that this incident occurred in 1993. The government argued in its opposition to this motion that Mr. Gentile "adopted" the 1993 date in his testimony. He did not. The testimony was:

Q  You testified that your best recollection is that it [the incident] was in '91 or '92?

A  It was the first sales meeting that we had in the Philadelphia plant.

Q  Now, you've testified about this subject before, haven't you?

A  Yes.

Q  And in March of the year 2000 you testified in front of the grand jury that this occurred in 1993, isn't that correct?

A  I don't have the transcript, but if that's what it says, that's that I said.

Tr. 158.

### B.  *1994–1996*

Mr. Grossman testified that the handwriting on the bottom of Mr. Sabzali's 1994 performance appraisal, which is dated May 16, 1995, "looks like" the printing of Mr. Brodie. Tr. at 516. Mr. Grossman did not

testify that he was familiar with Mr. Brodie's printing, nor did he explain the basis for his opinion.[3] The appraisal contained the following typed statements on the first page of the document: "Jim [sic] accomplishments are many throughout 1994. They include: Developing the Caribbean territory to make Purolite the dominant player[,] getting sales in Mexico as an adjunct to the Caribbean . . . ." Gov't Ex. 14.

## C. *1997–2000*

The government investigation into Bro–Tech's sales to Cuba began in late 1996, early 1997. The Customs Agent in charge of the investigation met with a Bro–Tech employee on February 5, 1997, and told the employee that it appeared that there had been illegal exports to Cuba. There followed shortly thereafter the appointment of a prosecutor and the service of a Grand Jury subpoena on April 4, 1997. There followed more subpoenas and a Grand Jury investigation that resulted in an indictment on October 5, 2000.

In the course of the investigation, on February 6, 1997, Customs Agent Andrew McCrossan sent to Bro–Tech employee Jack Dolan a circular that had been issued at some point before 1986 or 1989 by the office of Foreign Assets Control in the Department of Treasury. Gov't Ex. 190; Tr. at 1230–32. The circular summarized the Cuban Assets Control Regulations. Gov't Ex. 190. Agent McCrossan did not know whether the advice contained in this exhibit was current or accurate as of February 1997. Tr. at 1280–81.

Joan Graves, who retired from Bro–Tech in January 1999, testified that she received a call at home from the defendant in September 1999. Tr. at 581, 666. She told the defendant that the government had questioned her about the Galax sales, and that she recalled that there were shipments after Galax, but she couldn't remember the name of the company. Mr. Brodie said "Well, if you can't remember the name, you don't have anything to tell them." Tr. at 666.

Carlos Lugo testified that in April or May 1999, Tr. at 449, someone at the U.S. Embassy in Mexico City requested a meeting and Mr. Lugo met with that person. At trial, he testified that after the meeting he received a call from Stefan Brodie, who told Mr. Lugo, an employee of Bro–Tech at the time, to notify Stefan Brodie before going to such meetings in the future, Tr. at 398, because of Mr. Brodie's concern "that U.S. officials would be asking [Lugo] questions without company counsel present." Tr. at 451. Mr. Lugo admitted that he had previously testified before the grand jury that the person he spoke to after the meeting was Mr. Sabzali, not Mr. Brodie. Tr. at 451.

Mr. Lugo also testified about a telephone conversation in late 1999 during which Stefan Brodie asked Mr. Lugo to send certain records relating to IMI, one of the Mexican intermediaries, to Mr. Trumper, a "bookkeeper" in the United Kingdom to "safeguard them." Tr. at

---

**3.** There is much dispute between the parties as to whether a jury would give much, if any, weight to this testimony because there was no foundation laid for the lay opinion testimony. The witness never said that he had ever seen the printing of Mr. Brodie, let alone how many times he had seen it before. The defendant also complains that he was never told in discovery that the government contended that this was the defendant's handwriting or that the government would attempt to elicit lay opinion testimony at the trial. Because there was no objection to the testimony at trial, the Court will consider it as legitimate evidence that the jury could consider.

405.[4]

### IV. Analysis

The question the Court must answer is whether a rational jury could find beyond a reasonable doubt that the defendant knowingly and willfully joined a conspiracy to violate TWEA and the CACRs.

■ Knowingly means that a defendant was conscious and aware of his actions, and did not act because of ignorance, mistake or accident. *United States v. Weiler,* 458 F.2d 474, 475 (3d Cir.1972). *See also United States v. Lawson,* 780 F.2d 535, 542 (6th Cir.1985). Knowledge of a fact may be established from proof that a defendant was aware of a high probability that the fact existed and then deliberately and consciously tried to avoid learning whether the fact existed or not. *United States v. Wert–Ruiz,* 228 F.3d 250, 255 (3d Cir. 2000). Willfully means to voluntarily and intentionally violate a known legal duty, that is to say that the defendant acted with the bad purpose to disobey or disregard the law. *Bryan v. United States,* 524 U.S. 184, 191 n. 13, 196, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998).

■ To take the willfulness requirement first, there is no evidence that the defendant knew that sales to Cuba through Purolite International, the United Kingdom entity, violated the CACRs. The evidence is to the contrary. Edward Grossman testified that Stefan Brodie told him

in 1993, after the discussion with counsel during the Deloitte audit, that it was lawful for entities in the United Kingdom to ship product to Cuba. The defendant told Mr. Grossman that it was the position of Bro–Tech, going forward, that "there should not be any future transactions involving Bro–Tech in the United States that involved the sale of product to Cuba . . . ." Tr. 533. Knowledge of the sales through Purolite International, therefore, is not evidence of the defendant's knowing and willful membership in the conspiracy.

That same testimony of Mr. Grossman and the testimony of Mr. Coulter establishes that Mr. Brodie did know that it was illegal for the U.S. company to be involved in sales to Cuba. If there were evidence, therefore, that Stefan Brodie knew about the involvement of the U.S. company in some of the sales from 1994 through 1996, the Court will assume that a rational jury could find that he knowingly and willfully joined the conspiracy.[5]

Following is a discussion of the strongest evidence against the defendant.

1. Mr. Grossman testified that prior to the Deloitte audit, the defendant told him that there was a Galax invoice that had a reference to Cuba on it. The defendant told Mr. Grossman to instruct the billing department to make certain that they do not include any reference to Cuba in any future invoices on the face of the invoice.

---

**4.** The government also introduced into evidence two memoranda regarding sales to Cuba in 1997 that were carbon copied to Stefan Brodie.

**5.** The defendant also argued that there was not evidence from which a jury could conclude that he knew that involvement by the U.S. company violated the specific license requirement of the CACRs, as opposed to the CACRs generally. Without knowledge of and intent to violate that specific provision, Mr. Brodie argues that no jury could find that he

acted willfully even if he knew of U.S. involvement in the sales. One of the other defendants has said that he will make that same argument in his post-trial briefs. The Court does not intend to foreclose that argument by this decision. Because the Court finds that there was not sufficient evidence from which a jury could conclude that Stefan Brodie knew that the U.S. entity was involved in some of the transactions, the Court will not decide the license issue here.

Mr. Grossman gave such an instruction to the billing department. When asked if this happened in 1992, he said: "I believe so." A permissible inference from this testimony is that Mr. Brodie gave the instructions he did to Mr. Grossman to conceal sales to Cuba.

At the post-trial oral argument on this motion, the government argued that this statement set up the whole conspiracy, and Mr. Brodie never rescinded it. According to the government, this statement led to the way the transactions between 1994 through 1996 were handled; this led to a culture of using code words for Cuba.

This theory depends to a great extent on speculation and it does not take account of Mr. Grossman's testimony that Mr. Brodie told him in 1993 that the company's policy, going forward, was that there should be no sales to Cuba through the U.S. entities. The government never pursued with Mr. Grossman on redirect how the 1992 statement relates to the events of 1993 when Mr. Brodie set the new policy with respect to Cuba in motion.

The government does argue that, notwithstanding its own witness's testimony, there was no new policy. Either the 1993 memorandum, purporting to set forth a new policy, was a sham because it was never sent to anyone; or if it was sent to the addressees, it was "window dressing" to conceal and promote the conspiracy.

The only evidence the government has ever pointed to in support of its argument that the 1993 memorandum was a sham was Mr. Gentile's testimony that he did not get the memorandum. To jump from the fact that a salesman in the Southwest cannot recall, years later, getting a memorandum to the conclusion that the memorandum was never sent to anyone is the purest of speculation. The government's own witness, Edward Grossman, testified that he got it. On its face, the memorandum says it was faxed out to "[a]ll sales offices & Henri & Jack Evans & Don & Ed Grossman."

It is also speculation to argue that it was "window dressing" to conceal and promote the conspiracy. There is simply no evidence to support that. The fact that during the period 1994 through 1996, there were sales to Cuba that at times involved the United States is not evidence that the defendant intended the memorandum as a cover when there is not other evidence that he knew about the sales. Nor was there any evidence that Mr. Brodie or anyone else followed up the memorandum with either written or oral instructions that it was to be ignored.[6]

---

6. The government also argues that the defendant lied to Steven Coulter when he said that the sale to Galax was a single transaction by a salesman that was new to the company. The government argues that Mr. Sabzali had been in the company since 1990 so he was not new and the jury could infer that Mr. Brodie knew that there was more than one transaction with Galax because of Mr. Grossman's testimony that in 1992, Mr. Brodie told him about an invoice for a sale to Cuba.

There is no logical basis from which a jury could conclude as the government argues. There was no evidence that Mr. Sabzali had been with the company since 1990. The only evidence on this issue was that he was there in 1991. It may be proper to infer that Mr.

Brodie knew that Mr. Sabzali had been with the company since 1991 but it would be a stretch to conclude that Mr. Brodie lied when he told Mr. Coulter that Mr. Sabzali was a new salesman. The sale occurred in 1992; a salesman who had been there for a year when the transaction occurred was new. There is not evidence from which a reasonable juror could infer that Mr. Brodie knew that there were four sales, and not only one sale, to Galax. He told Mr. Grossman about one sale and Deloitte found one sale. There is no basis on which to conclude that these were the same or different sales. It would be speculation—not the proper use of inferences—to infer that he really knew that there were four.

2. Craig Gentile testified that in 1991, 1992, or 1993, James Sabzali gave a presentation during which he mentioned business in Cuba. The defendant "jumped up" and said something to Mr. Sabzali who replied: "Well, I mean our friends in the Caribbean." It is difficult to know what a rational juror could properly infer from this evidence. The Deloitte audit occurred in 1993 and the first sales charged in the indictment occurred in 1994. The government argues that it shows that the defendant was trying to cover up illegal sales to Cuba. The defendant argues that there is no basis for such an inference. The defendant argues that without any evidence of what he said, a negative inference is not warranted. Mr. Brodie argues further that if this occurred in 1993, as the government argues, the logical inference is that this statement by Mr. Brodie was part of his attempt to comply with the law by not having any U.S. involvement in the sales.

Neither inference seems logical to the Court. To come to either conclusion would be speculation. One could infer that Mr. Brodie did not want Cuba mentioned but the why is critical and we cannot tell why from the testimony. The contradictory testimony about the timing of the statement makes almost any inference speculative.

3. Government's exhibit 14 is the performance evaluation of James Sabzali, dated May 16, 1995. Mr. Grossman testified that the printing on the bottom "looked like" the printing of Stefan Brodie.

A jury could conclude from Government's Exhibit 14 that the Caribbean meant Cuba and that Mr. Brodie read the memorandum and saw the reference. He, therefore, would have known that Bro–Tech was selling product to Cuba. He would not have known from the memorandum, however, that the product was coming from or through the United States. It could have been manufactured in and sent from Purolite International, as was the case with the pre–1994 and 1997–1999 sales and some of the 1996 sales.

This evidence raises the issue of willful blindness to the facts. I gave such an instruction to the jury over the objection of the defendants. I do not think that this document is sufficient proof that the defendant was aware of a high probability that there was U.S. involvement in the sales and deliberately and consciously tried to avoid learning whether the fact existed or not. *See United States v. Wert–Ruiz*, 228 F.3d 250, 255 (3d Cir.2000).

4. The 1999 telephone conversation with Joan Graves. The government argues that the jury could infer that the defendant sought to conceal his wrongdoing, *i.e.*, shipments to Cuba through intermediaries during 1994–1996. The defendant argues that there is no evidence that his remark had any prospective element to it. There is no evidence that he knew that Ms. Graves would be talking to the government in the future.

The government's inference is a fair one; but that inference does not shed any light on whether the defendant knew about the 1994 to 1996 shipments before or at the time they were occurring. This conversation took place two years after the government had started its investigation. Mr. Brodie surely would have known about the shipments at that point because the government had already served several document subpoenas.

5. 1999 Conversation with Carlos Lugo. This is also in the middle of the government's investigation of Bro–Tech. A rational juror could not make a negative inference here. The defendant was telling an employee to let him know if he is called in again to the U.S. Embassy because of a concern "that U.S. officials would be ask-

ing [Lugo] questions without company counsel present."

When the Court puts together the evidence against the defendant with its permissible inferences, it finds that there is insufficient evidence to allow a rational juror to find guilt beyond a reasonable doubt. There was evidence that in one instance in 1992 (the discussion with Mr. Grossman) and one instance in 1991, 1992, or 1993 (the statement at the sales meeting described by Mr. Gentile), Mr. Brodie told people not to use the word Cuba when referring to transactions with Cuba. There was evidence that in 1995, Mr. Brodie knew that Mr. Sabzali was doing business with Cuba (the performance evaluation of Mr. Sabzali), but the memorandum does not say anything about the source of the product. If he thought it was coming from Purolite International, he would not have acted willfully because the evidence was undisputed that the defendant believed that it was legal to ship from the United Kingdom. There was evidence that in 1999, while the investigation by the government was in progress, the defendant called a former employee to find out what she told the government and made a statement that could be viewed as an attempt to make sure that she did not volunteer any information in the future. The Lugo discussion adds very little, if anything, to the government's case.

The government argues that the Court should also take into account the fact that the defendant was CEO of the company, that defendant Don Brodie knew about the sales, and that they had offices next to each other and are brothers. The Court is very reluctant in a criminal conspiracy case, where the required mental state is knowledge and willfulness, to give any weight to these points. In addition, there was testimony that during the relevant time period, Stefan Brodie spent 70–80% of his time out of the country opening plants in Romania and China. Tr. 555–556.

Having listened carefully to all the testimony during the trial and now having read carefully the transcript and reviewed the documents, the Court finds that there is insufficient evidence of the defendant's knowing and willful participation in the charged conspiracy.

An appropriate order follows.

## ORDER

And now, this 31st day of May, 2002, upon consideration of the defendant Stefan Brodie's oral motion for judgment of acquittal under Fed.R.Crim.P. 29(a), the government's response and supplemental response thereto, the defendant's reply, and supplemental submissions thereon from both the government and Stefan Brodie, and following oral argument, IT IS HEREBY ORDERED that the motion is GRANTED.