UNITED STATES of America, Appellant

v.

Gary WASSERSON.

No. 04–1339.

United States Court of Appeals, Third Circuit.

Argued Nov. 18, 2004.

July 29, 2005.

Patrick L. Meehan, United States Attorney, Laurie Magid, Deputy United States Attorney for Policy and Appeals, Robert A. Zauzmer, Assistant United States Attorney, Senior Appellate Counsel, Catherine L. Votaw (Argued), Anita Eve, Assistant United States Attorneys, Philadelphia, PA, for Appellant.

Robert D. Fox (Argued), Manko, Gold, Katcher & Fox, LLP, Bala Cynwyd, PA, for Appellee.

Before: SCIRICA, Chief Judge, and MCKEE and CHERTOFF,* Circuit Judges.

## OPINION OF THE COURT

MCKEE, Circuit Judge.

We are asked to review the district court's grant of the defendant's motion for judgment of acquittal on Count Three of an indictment charging Gary Wasserson with causing, and aiding and abetting, the disposal of hazardous waste without a permit in violation of the Resource Conservation and Recovery Act, 42 U.S.C. § 6928(d)(2)(A) and 18 U.S.C. § 2. For the reasons that follow, we will reverse.

## I. FACTUAL BACKGROUND

Gary Wasserson was the president and chief executive officer of Sterling Supply Company, located in Philadelphia, Pennsylvania. Sterling supplied commercial laundry and dry cleaning products to dry cleaning establishments in Philadelphia, Pennsylvania, Virginia Beach, Virginia, and Hanover, Maryland. Sterling had a warehouse in Philadelphia where it stored cleaning products consisting of cleaners, soaps and detergents, as well as equipment and business records. When Sterling went out of business in 1994, the warehouse contained hundreds of containers of chemicals, including napthene, acetone and perchloroethylene.

After Wasserson closed Sterling in 1994, he began selling off remaining inventory. In 1999, Wasserson met with Samuel Graboyes. Sterling had sold Graboyes dry cleaning supplies in 1995, and Wasserson offered to give Graboyes some of the remaining supplies free of charge. Graboyes declined the offer and told Wasserson to contact a hazardous waste hauling company to dispose of the remaining supplies. Wasserson replied by telling Graboyes that he had already contacted such companies, but that it was costly to have them dispose of the remaining inventory.

Charles Hughes was a Sterling employee from 1980 through 1994. His job involved transporting Sterling's inventory and products, first in a box truck and later in a tractor-trailer. After 1994, Wasserson worked for another company in northern New Jersey and Hughes worked as a driver for him at that company. Wasserson claimed that he put Hughes in charge of Sterling's warehouse and that he (Wasserson) rarely visited it.

According to the government, in August of 1999, Wasserson asked Hughes to hire someone to remove the remaining materials at Sterling's warehouse. The material included scrap metal, wooden pallets, debris and hundreds of containers of chemicals. The government further claimed

---

* Judge Chertoff heard oral argument in this case but resigned before the opinion was filed. The opinion is filed by a quorum of the panel. 28 U.S.C. §§ 46(d).

that Hughes had no experience in transporting or disposing of hazardous waste and no knowledge of the Resource Conservation and Recovery Act ("RCRA") which we will discuss below. In response to Wasserson's request, Hughes consulted the yellow pages and found a company named, "Davis Rubbish Removal" under the heading, "Rubbish & Garbage Removal." Hughes then proceeded to contact Charles Davis, a rubbish removal contractor who had no environmental experience. The government claims that Wasserson never communicated directly with Davis about the removal. Rather, Wasserson telephoned Davis's receptionist and dictated a contract. That contract gave Davis responsibility for properly disposing of the chemicals at a "legal dumpsite." In turn, Davis hired a disposal company called, "Will–Haul, Inc.," to provide dumpsters, remove them once filled, and dispose of their contents.

Wasserson admits that he called Hughes in August of 1999, but claims that he instructed Hughes to have all of the trash (file cabinets, paper, wooden pallets, and equipment) removed from certain parts of the warehouse in preparation for a potential tenant. Hughes testified that both he and Wasserson intended that Hughes remove only the trash and not any of the chemical products that were stored in the warehouse. Wasserson conceded that Hughes contacted Davis Rubbish Removal, but claimed not to know how Hughes selected Davis.

Hughes testified that when Davis visited the warehouse in late August of 1999 to inspect the trash removal job, he inquired about the steel racks where the drums of cleaners and chemicals were stored. Hughes purportedly told Davis that the drums and the racks were not part of the job because the drums held chemicals. Hughes testified that Davis volunteered

the fact that he had experience in disposing of such materials: "we've done this dozens of times, we do this all the time." Hughes replied: "this might be something that Mr. Wasserson would be interested in at this point to clean the whole warehouse out versus just the trash."

Davis telephoned Hughes shortly afterwards with an estimate for the work. That estimate was originally $14,500, but was later reduced to $13,000. According to Wasserson, Davis stood to collect $14,000 or more from selling the large amount of scrap metal, which included stainless steel, brass, copper and cast iron. However, Davis testified that he factored the resale price of the scrap metal into his estimate.

Hughes telephoned Wasserson and told him that Davis was willing to remove the hazardous waste as well as the trash, that Davis said he would handle the waste properly, and that Davis said he had "been doing this for year[s]." Wasserson claimed to have told Hughes that Davis could only remove the waste if it would be handled properly. Wasserson purportedly insisted that this requirement be put in writing.

Davis's secretary, Ethel Briscoe, testified that Wasserson called Davis's office before the work began to ensure that the contract contained language requiring that the waste be properly handled. According to Briscoe, Wasserson dictated the following for inclusion in the contract: "Remove all scrap metal, debris, trash and pallets throughout building. Remove all chemicals to legal dumpsite. Davis Rubbish Removal will take full responsibility for job." Briscoe signed the contract on behalf of Davis.

Davis then arranged to have empty dumpsters delivered to the warehouse. Davis planned to fill them with trash and hazardous waste and send them to the

Girard Point Transfer Station, a municipal solid waste transfer station in Philadelphia. However, the first dumpster that was to be used contained a sticker that read, "No Hazardous Chemicals." Since Davis knew that the drums contained hazardous waste, he contacted a different company, "Will–Haul, Inc.," which delivered dumpsters that did not contain any such stickers. Davis testified that he told Will–Haul's proprietor, Carlos Rivera, about the hazardous nature of the cleaners and chemicals, and that Rivera agreed to take them. Rivera testified that has been in the waste business for 31 years.

Hughes helped Davis load the drums and trash into the dumpsters, while Davis and his employees focused on collecting the scrap metal. Hughes, believing that the drums were being transported to a location where they would be sorted and transferred to their ultimate destinations, shrink-wrapped them to avoid leaks and spills. Hughes kept drums that were not in pristine condition. Hughes left labels on the drums that bore the Sterling name and address and disclosed their contents.

On September 7, 1999, Rivera picked up a dumpster at Sterling's warehouse that contained hazardous waste and transported it to the Girard Point Transfer Station. However, when Rivera dumped the load onto the floor at Girard Point he saw the drums containing hazardous materials. Rivera knew the drums could not be accepted at the transfer station. Indeed, he had told Davis that he would not accept drums. However, the transfer station operator loaded the drums into a landfillbound truck. The contents of the dumpster were commingled with other trash, loaded into a container and transported to Modern Landfill, a solid waste landfill in York, Pennsylvania, that did not have a permit to receive hazardous waste.

When the container was unloaded at the landfill, employees recognized an organic, paint-like odor coming from containers with Sterling labels on them. Landfill employees immediately shut down the affected part of the landfill and isolated the area. Thereafter, environmental specialists discovered that the drums were filled with hazardous waste.

Later that same day, a representative from the Pennsylvania Department of Environmental Protection ("PaDEP") arrived at Sterling's warehouse and alerted Hughes to the problem. Wasserson was contacted and arrived at the warehouse later that evening. Wasserson claimed that because most of the chemical drums had never left the warehouse, he personally undertook to have them properly removed from the premises.

According to the government, neither Wasserson nor Hughes, his representative, provided Davis or Will–Hall with the required hazardous waste manifest identifying the items for disposal. Similarly, no one informed Davis or Will–Haul that the drums and containers contained hazardous waste and therefore had to be transported to, and disposed of at, a permitted facility pursuant to the RCRA. Neither Girard Point nor Modern Landfill had a hazardous waste permit. The government claimed that neither Wasserson nor Davis nor Will–Hall complied with the RCRA. According to the government, that Act requires that persons possessing hazardous waste must prepare a manifest identifying the waste, properly transport the waste to a RCRA-permitted hazardous waste disposal facility, and dispose of the waste only at such a facility.

At trial, Wasserson stipulated that he knew that a manifest must accompany hazardous waste when shipped for disposal; that a facility that receives the hazardous waste must have a permit; and that haz-

ardous waste may properly be disposed of only at a facility that has obtained a permit from either the Environmental Protection Agency or the Commonwealth of Pennsylvania.[1] Wasserson also stipulated that he knew that the materials being disposed of were hazardous wastes.

## II. DISTRICT COURT PROCEEDINGS

Wasserson was indicted by a federal grand jury and charged with three counts of violating the RCRA: causing, and aiding and abetting, the transportation of hazardous waste without a manifest, in violation of 42 U.S.C. § 6928(d)(5) and 18 U.S.C. § 2 (Count One); causing, and aiding and abetting, the transportation of hazardous waste to facilities which were not authorized to store or dispose of hazardous waste, in violation of 42 U.S.C. § 6928(d)(1) and 18 U.S.C. § 2 (Count Two); and causing, and aiding and abetting, the disposal of hazardous waste without a permit, in violation of 42 U.S.C. § 6928(d)(2) and 18 U.S.C. § 2 (Count Three).

A jury convicted Wasserson of all three counts at the end of a three-day trial. Thereafter, Wasserson filed a motion for new trial on Counts One and Two pursuant to Fed.R.Crim.P. 33. He argued that the court's instructions did not properly inform the jury about the element of knowledge required for conviction on those counts. He also moved for a judgment of acquittal on those counts under Rule 29. Wasserson similarly moved for a judgment of acquittal on Count Three, arguing that 42 U.S.C. § 6928(d)(2)(A) only applied to owners and operators of disposal facilities, and that he could therefore not be convicted of violating that statute.

The government conceded that the trial court's instructions on Counts One and Two were erroneous, and it therefore did not oppose Wasserson's motion for a new trial on those counts.[2] However, the government did oppose the motions for judgment of acquittal with respect to Counts One through Three.

The district court granted Wasserson's motion in part, ordering a new trial on Counts One and Two and granting judgment of acquittal on Count Three. *United States v. Wasserson,* 2004 WL 433824 (E.D.Pa. Jan.12, 2004). The judgment of acquittal on Count Three rested on the court's conclusion that "one who merely generates but does not carry out the disposal of hazardous waste cannot be convicted under subsection (d)(2)(A)." *Id.* at *3.

■ The government moved for reconsideration of the judgment of acquittal on Count Three arguing that it had charged Wasserson with aiding and abetting disposal of hazardous waste in violation of 42 U.S.C. § 6928(d)(2)(A) and 18 U.S.C. § 2. The district court disagreed, and this appeal followed.[3]

---

1. As we will explain further below, Michael Tatch, an environmental consultant hired by Wasserson well before the September 1999 incident, had advised Wasserson of RCRA's requirements for the transportation and disposal of hazardous waste.

2. The government explains: "Inadvertently and due to a clerical error, the government provided proposed jury instructions to the district court on a computer disk which did not match those submitted to the court and

defense counsel on paper. The paper version was discussed, modified, and agreed to during a charging conference. That version properly addressed the knowledge requirement. However, the computer disk version was read to the jury, and that set of instructions lacked the proper knowledge requirement." Government's Br. at 5 n. 1.

3. "[I]t is well-settled law that a judgment of acquittal may be appealed so long as an order reversing the district court would not result in

## III. DISCUSSION

The government makes two arguments on appeal. First, it claims the district court erred in holding that "one who merely generates but does not carry out the disposal of hazardous waste cannot be convicted under subsection (d)(2)(A)." Second, the government argues that the evidence was sufficient to establish that Wasserson aided and abetted the unlawful disposal of hazardous waste. Each argument is discussed separately below.

### A. A Generator Of Hazardous Waste Can Be Convicted Under Subsection (d)(2)(A).

Section 6928(d) of the RCRA provides criminal penalties for any person who, *inter alia:*

(1) knowingly transports or causes to be transported any hazardous waste identified or listed under this subchapter to a facility which does not have a permit under this subchapter, . . . .

(2) knowingly treats, stores, or disposes of any hazardous waste identified under this subchapter—

(A) without a permit under this subchapter . . . . or,

 \* \* \* \* \* \*

■ (5) knowingly transports without a manifest, or causes to be transported without a manifest, any hazardous waste or any used oil not identified or listed as a hazardous waste under this subchapter required by regulations promulgated under this subchapter (or by a State in the case of a State program authorized under this subchapter) to be accompanied by a manifest; . . . .

42 U.S.C. §§ 6928(d)(1), (d)(2)(A), (d)(5). Wasserson was convicted of violating each of these subsections. But the district court granted Wassersons' motion for judgment of acquittal on Count Three, holding that one who generates hazardous waste cannot be convicted under § 6928(d)(2)(A) without actually disposing of it.[4]

On appeal, the government contends that any or all of the separate RCRA offenses enumerated under § 6928(d), including the prohibition on unlawful disposal, can give rise to aiding and abetting liability under 18 U.S.C. § 2. We agree. 18 U.S.C. § 2 provides:

(a) Whoever commits an offense against the United States or aid, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

■ We have previously explained that every "indictment must be read as if 18 U.S.C. § 2 were embodied in each count." *United States v. Forsythe*, 560 F.2d 1127, 1136 n. 15 (3d Cir.1977). Accordingly, the "indictment need not specifically charge aiding and abetting in order to support a conviction for aiding and abetting." *Id.*

The district court set a new trial date on Counts One and Two for March 8, 2004, but stayed the trial at the government's request pending the resolution of its appeal.

a retrial. . . . If this court were to reverse the judgment of acquittal that was granted after the jury verdict of guilty, then the verdict would merely be reinstated and the defendant would not have to be retried. As such, the double jeopardy clause would not be violated." *United States v. Coleman*, 811 F.2d 804, 805 (3d Cir.1987) (citations omitted).

4. We have plenary review of the district court's interpretation of a statute. *Gibbs v. Cross*, 160 F.3d 962, 964 (3d Cir.1998).

The general rule is that in order to convict a defendant of aiding and abetting the commission of a substantive offense, the proof must establish that the crime in question was committed by someone and that the person charged as an aider and abettor, aided and abetted in its commission. It is not a prerequisite to the conviction of the aider and abettor that the principal be tried and convicted or in fact even be identified. Each participant in an illegal venture is required to stand on his own two feet. An individual may be indicted for commission of a substantive crime by proof showing him to be an aider and abettor. *United States v. Provenzano*, 334 F.2d 678, 691 (3d Cir.1964) (citations and internal quotations omitted). Moreover, a defendant can be convicted as an aider and abettor under § 2(b) for causing an innocent intermediary to commit a crime. *United States v. American Investors of Pittsburgh, Inc.*, 879 F.2d 1087, 1094–95 (3d Cir.1989).[5]

■ Here, the government specifically charged Wasserson as both a principal and an aider and abetter under 42 U.S.C. §§ 6928(d)(1), (d)(2)(A), and (d)(5). These RCRA provisions target different groups of defendants, and constitute separate offenses. Transportation of hazardous waste to an unpermitted facility is one RCRA offense, unlawful disposal is another, and transportation without a manifest is still another. We believe it is clear that Congress intended to punish each act separately because of the separate dangers each pose. As we have previously explained, the "RCRA was enacted to provide a *multifaceted* approach towards solving the problems associated with the 3–4 billion tons of discarded materials generated each year, and the problems resulting from the anticipated 8% annual increase in the volume of such waste." *United States v. Johnson & Towers*, 741 F.2d 662, 666 (3d Cir.1984) (emphasis added) (citation and internal quotations omitted).

■ We therefore reject Wasserson's argument that convicting him of both the transportation offense—§ 6928(d)(1)—and the disposal offense—§ 6928(d)(2)(A)—would result in duplicate criminal liability for the same conduct. Transporting and disposing are distinct acts. Knowingly transporting or causing the transport of hazardous waste to an unpermitted facility—a violation of subsection (d)(1)—is not the same thing as disposing of the hazardous waste at such a facility—a violation of subsection (d)(2)(A). Under the RCRA, "disposal" means the "discharge, deposit, injection, dumping, spilling, leaking or placing of . . . hazardous waste into or on any land or water so that such . . . waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3). Congress evidently realized that a generator of hazardous waste might dispose of the waste where it was generated, without transporting it to another location. When that happens, there is no transportation to sanction. However, where the generator further endangers the public by first transporting hazardous waste and then unlawfully disposing of it, separate offenses are committed.

The government sought to prove that Wasserson was responsible for causing and aiding and abetting the transportation of hazardous waste to an unpermitted facility, and for aiding and abetting its unlawful disposal. The crimes of illegal transportation and illegal disposal of hazardous waste

---

**5.** It also well settled that conviction as an aider and abettor is not precluded by the principal's acquittal, *see United States v. Standefer*, 610 F.2d 1076, 1088–89 (3d Cir.1979).

each contain an element the other does not. Accordingly, he could have properly been convicted of both offenses under the applicable sections of the RCRA. *See Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932) ("Each of the offenses created requires proof of a different element. The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not.").[6]

Wasserson nevertheless contends that the text and structure of the statute impliedly foreclose aiding and abetting liability for unlawful disposal under subsection (d)(2)(A). This is so, according to Wasserson, because subsection (d)(2)(A) does not expressly address those who "cause" the unlawful disposal—whereas the preceding subsection, § 6928(d)(1), penalizes anyone "who knowingly transports *or causes to be transported* any hazardous waste ... to a facility which does not have a permit." (emphasis added). Wasserson contends that, by mentioning causation liability in subsection (d)(1) but omitting it from subsection (d)(2)(A), Congress must have intended to penalize under (d)(2)(A) only the actual disposer of the hazardous waste and not one who causes, aids or abets the disposal.

We cannot accept this argument without ignoring the fundamental doctrine of vicarious liability embodied in 18 U.S.C. § 2. In 1948, Congress amended that statute by adding subsection (b). Subsection (b), in turn, was further amended in 1951.

> The House report explaining this 1948 provision instructed that the purpose of § 2(b) was to permit the deletion from criminal provisions of words such as "causes or procures" and to remove any doubt that the legislature intended that one who causes the commission of an indispensable element of an offense against the United States by an innocent agent or instrumentality be guilty as a principal. This provision was in accord with Supreme Court decisions in *Ruthenberg v. United States*, and *United States v. Giles[.]*

> \* \* \* \* \* \*

> In the Senate Report accompanying the proposed amendment it was explained that the section: [i]ntended to clarify and make certain the intent to punish aiders and abettors regardless of the fact that they may be incapable of committing the specific violation which they are charged to have aided and abetted. . . .

*United States v. American Investors of Pittsburgh, Inc.*, 879 F.2d at 1094 (citations omitted).

---

**6.** Wasserson concedes that transporting and disposing are distinct acts and that a generator can be a disposer. However, he argues that there is no evidence that he disposed of his own hazardous waste in violation of § (d)(2)(A). Rather, he submits, albeit without admitting it, that there is only evidence that he caused his hazardous waste to be transported to an unpermitted facility in violation of § (d)(1). Therefore, he concludes that the same conduct—causing hazardous waste to be transported to an unpermitted facility—is the basis for his conviction of the disposal offense and improperly exposes him to duplicate criminal liability for the same conduct if convicted of violating §§ (d)(1) and (d)(2)(A). As we explained above, that argument ignores the government's theory that he aided and abetted the disposal. His argument also ignores the fact that someone can generate hazardous waste that is thereafter properly transferred by a licensed hauler for disposal at a facility that has an appropriate permit to dispose of hazardous waste. Thus, illegal transportation does not automatically result in illegal disposal.

It is well-settled that 18 U.S.C. § 2 applies to the entire federal criminal code unless Congress clearly provides to the contrary. *United States v. Frorup,* 963 F.2d 41, 42 n. 1 (3d Cir.1992) ("aiding and abetting is implied in every federal indictment for a substantive offense"); *Forsythe,* 560 F.2d at 1136 n. 15 (3d Cir. 1977); *accord United States v. Ramirez–Martinez,* 273 F.3d 903, 911 (9th Cir.2001); *United States v. Hill,* 55 F.3d 1197, 1206 (6th Cir.1995); *United States v. Pino–Perez,* 870 F.2d 1230, 1233 (7th Cir.1989). The omission of causation language from § 6928(d)(2)(A) is insufficient to indicate a clear Congressional intent to override the plain language of 18 U.S.C. § 2.[7] Accordingly, we must recognize aiding and abetting liability under subsection (d)(2)(A).

*United States v. Fiorillo,* 186 F.3d 1136 (9th Cir.1999) is not to the contrary. There, storers of hazardous waste were charged with knowingly storing hazardous waste in violation of § 6928(d)(2) and knowingly transporting or causing the transport of hazardous waste in violation of § 6928(d)(1). The government's theory apparently was that a person who stores hazardous waste must, of necessity, have caused that waste to be transported illegally.

The jury convicted the hazardous waste storers of both charges. On appeal, they argued that a storer of hazardous waste does not necessarily cause the stored waste to be transported. The court of appeals agreed explaining:

> [S]ubsections (d)(1) and (d)(2) penalize two distinct sets of acts involving the handling of hazardous waste without a permit. Subsection (d)(1) addresses transporting and causing to be transported hazardous waste to ·a facility lacking a permit, whereas (d)(2) addresses treating, storing, and disposing of hazardous waste without a permit. By dividing those activities into two categories, Congress demonstrated that, despite the similarities between the prohibitions in subsections (d)(1) and (d)(2), it intended to distinguish between these two groups of conduct in some way. The principal distinction is that subsection (d)(1) describes activities connected to the creation and shipping of hazardous waste, while subsection (d)(2) covers only the receipt and processing of the waste. Stated another way, subsection (d)(1) pertains to the direction of hazardous waste to a facility that lacks a permit, whereas subsection (d)(2) addressed activities occurring at the unpermitted facility.

186 F.3d at 1147. In short, the court of appeals held that subsections (d)(1) and (d)(2) were separate crimes with distinct

---

**7.** Wasserson does not argue that Congress's addition of the causation language to the transportation provisions of §§ 6928(d)(1) and (d)(5), acted as an implied repeal of 18 U.S.C. § 2(b) as applied to disposal provision of §§ 6928(d)(2)(A). In *Posadas v. National City Bank of New York,* 296 U.S. 497, 503, 56 S.Ct. 349, 80 L.Ed. 351 (1936) the Supreme Court held that "repeals by implication are not favored."

Where there are two acts upon the same subject, effect should be given to both if possible. There are two well-settled categories of repeals by implication: (1) Where provisions in the two acts are in irreconcil-

able conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one; and (2) if the later act covers the whole subject of the earlier one and is clearly intended as a substitute, it will operate similarly as a repeal of an earlier act. But, in either case, the intention of the legislature to repeal must be clear and manifest; otherwise, at least as a general thing, the later act is to be construed as a continuation of, and not a substitute for, the first act and will continue to speak, so far as the two acts are the same, from the time of the first enactment. *Id.*

elements. Thus, a conviction for one does not automatically mean a conviction for the other.

 In explaining its order granting judgment of acquittal, the district court quoted the same excerpt we have just quoted. The district court then explained that "[t]his distinction ... evinces Congress' intent that one who merely generates but does not carry out the disposal of hazardous waste does not incur liability under subsection (d)(2)(A)." 2004 WL 433824 at *4. However, unlike *Fiorillo,* the issue here is not whether one who is guilty of generating hazardous waste must, of necessity, also be guilty of illegally disposing of it in violation of § 6928(d)(2)(A). Rather, the government concedes that disposal is a separate crime from transportation, and that it must prove both beyond a reasonable doubt to sustain convictions under the applicable subsections. The issue here is whether Wasserson can be convicted of the illegal disposal if he did not himself dispose of the hazardous waste. If the elements of aiding and abetting the principal offense are established beyond a reasonable doubt, then it is clear that he can be convicted.

## B. The Evidence Was Sufficient to Convict Wasserson of Aiding and Abetting the Unlawful Disposal of Hazardous Waste.

Alternatively, the district court ruled that Wasserson was entitled to a judgment of acquittal on the disposal violation because the evidence was insufficient to establish that he engaged in any activity that required a permit. 2004 WL 433824 at *5. However, the alternative rational has nothing to do with the government's contention that there was sufficient evidence that Wasserson aided and abetted the improper disposal to support a conviction for violating § 6928(d)(2)(A).

Wasserson claims that the government's theory of liability under that subsection was that he basically became the operator of an unpermitted facility by causing hazardous waste to be transported to it. However, argues Wasserson, the government's case collapsed when PaDEP Agent Myron Suchodolski testified that "[d]epending on the operations that [Wasserson was] conducting at that site [he] may not have needed a permit from [PaDEP]." Wasserson claims that, on the basis of Suchodolski's testimony, the district court concluded that the government had offered insufficient evidence to convict under § 6928(d)(2)(A) since he had to have been engaged in activities requiring a permit to be convicted under that subsection.

Wasserson also claims that, because of Suchodolski's testimony at trial, the government has changed its theory of the case on appeal and is now arguing that Wasserson violated § 6928(d)(2)(A) as an aider and abettor. Wasserson insists that the aiding and abetting theory was never briefed in the district court. However, as the government correctly notes, the indictment charged aiding and abetting, the government produced evidence of aiding and abetting, the government argued aiding and abetting liability to the jury, and the district court instructed the jury on aiding and abetting without any objection from Wasserson. We are therefore hard pressed to understand Wasserson's contention that the government is now changing its theory on appeal.

 The government suggests that the district court's ruling that the evidence was insufficient to convict Wasserson is based on a misinterpretation of § 6928(d)(2)(A), because the district court obscured the interplay between the permit requirement and the disposal charge. The permit requirement, 42 U.S.C. § 6925(a), simply means that a disposal facility must

have a proper permit to handle hazardous waste. Thus, says the government, one of the factual predicates for illegal disposal is the facility's lack of a permit. The government argues that requirement was satisfied because Modern Landfill did not have a permit for disposing of hazardous waste. Since the disposal charge rises or falls on Wasserson's liability as an aider and abettor, his own possession of a permit is not the least bit relevant to his liability for causing disposal at an unpermitted facility. If he aided the disposal of hazardous waste there, the charge is proven.

 Lastly, the government argues that the evidence was sufficient to establish that "Wasserson aided and abetted, and willfully caused the disposal of hazardous waste at a non-permitted facility." Appellant's Br. at 37. "Our standard in examining a post-verdict judgment of acquittal is the same as that which the trial court applied." *United States v. Iafelice,* 978 F.2d 92, 94 (3d Cir.1992) (citation omitted). "We must view the evidence in the light most favorable to the jury verdict and presume that the jury properly evaluated credibility of the witnesses, found the facts, and drew rational inferences." *Id.* (citation omitted). "The verdict of the jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *Id.* (quoting *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942)).

 The government bottomed its aiding and abetting theory on the premise of Wassersons' willful blindness in handling the disposal of the hazardous waste. "A willful blindness instruction is often described as sounding in deliberate igno-

rance." *United States v. Wert–Ruiz,* 228 F.3d 250, 255 (3d Cir.2000) (citation and internal quotations omitted). "Such instructions must be tailored ... to avoid the implication that a defendant may be convicted simply because he or she should have known of facts of which he or she was unaware." *Id.* "Willful blindness is not to be equated with negligence or lack of due care, for willful blindness is a subjective state of mind that is deemed to satisfy a scienter requirement of knowledge." *Id.* (citation and internal quotations omitted). "The instruction must make clear that the defendant himself was subjectively aware of the high probability of the fact in question, and not merely that a reasonable man would have been aware of the probability." *Id.* (citation and internal quotations omitted).[8]

Our review of the evidence in the light most favorable to the government leads us to conclude that there was clearly sufficient evidence for a reasonable jury to find that Wasserson was willfully blind to the ultimate destination of his hazardous waste.

Wasserson had owned Sterling since about 1980, and was actively involved in running the business. Although Sterling ceased operations around 1993 or 1994, Wasserson kept the warehouse. Wasserson knew the warehouse contained dry cleaning products, and Wasserson concedes that he knew the products constituted hazardous waste.

Wasserson also knew the requirements for handling hazardous waste and, particularly for handling hazardous dry cleaning chemicals. From about mid–1989 through 1990, Wasserson employed an environmental consultant, Michael Tatch, to advise him on a number of regulatory matters,

---

8. The district court did charge on willful blindness, and Wasserson did not object to

the instruction that the court gave.

including transporting hazardous waste. Government's Appendix ("GA") at 283–84. At one point, Wasserson was interested in expanding his business into hauling hazardous waste from dry cleaners. *Id.* at 284–85. At another point, Wasserson asked Tatch about becoming a disposal facility, and Tatch reviewed the requirements for generators, haulers and disposers of hazardous waste with Wasserson. *Id.* at 285–86.

Tatch also instructed Wasserson about the importance of manifests and their relevance to the regulatory framework governing hazardous waste. *Id.* at 286–88. He told Wasserson that generators were required to manifest their waste, and that transporters had to sign those manifests and pass them along to those who took possession as well as to state agencies. Tatch described the information that a manifest must contain. *Id.* He specifically covered the obligation of a generator of waste to provide a manifest if it generates more than 220 pounds of waste, and he advised Wasserson that it is the generator's responsibility to ensure that any waste leaving the generator's control has a properly completed and signed manifest. *Id.* at 288–89.

Thus, as Wasserson stipulated, he knew that a completed manifest must accompany any hazardous waste shipped for disposal; that hazardous waste may only be transported to a facility that has a proper permit; and that a facility that disposes of hazardous waste must also have a proper permit to do so. Significantly for our purposes, Wasserson also knew that the proper disposal of hazardous waste was expensive.

Wasserson asked Hughes, his intermediary and employee, to find someone to clean out the trash in the warehouse. When Hughes reported back to Wasserson that Davis would clear everything out, includ-ing the hazardous wastes, Wasserson told Hughes to get it in writing because he did not want any problems.

In contrast to Wasserson's knowledge about the requirements for handling hazardous waste, Hughes knew nothing about hazardous waste disposal. Hughes had worked for Wasserson at Sterling from about 1980 as a truck or tractor-trailer driver making deliveries of dry cleaning supplies. Before Wasserson hired him, Hughes had also been a truck driver. After Sterling closed in 1993 or 1994, Hughes was Wasserson's chauffer for a few years. He also undertook various assignments for Wasserson, such as general clean-up of the warehouse, and helping load trucks for people interested in any of the goods at the warehouse. One of these assignments included hiring someone to get rid of the trash in the warehouse.

Before he hired Davis, Hughes had never been involved in disposing of Sterling's supply of hazardous waste. He knew nothing about the legal and technical requirements for a manifest. All that he did know was that if a manifest was needed on a job he drove, it was provided by "the office upstairs." Hughes did not participate in preparing any manifests. It was only after Davis disposed of the hazardous waste that Hughes first saw a manifest, which had been provided by a company called, "Onyx" that was eventually hired to perform a proper clean-up of the warehouse.

Given this evidence, Wasserson's level of knowledge about the legal requirements for handling hazardous waste, and Hughes's lack of knowledge; a jury could reasonably infer that Wasserson's failure to make proper inquiry and to provide a proper manifest were tantamount to willful blindness to the ultimate destination and disposal of the waste. Wasserson did not ask Davis, and Hughes did not even know

to ask Davis, about the essential requirements for the proper transport and disposal of Sterling's hazardous waste. Wasserson did communicate directly with Davis's company, but only to ensure that Davis agreed to assume responsibility for the waste. Wasserson spoke to Davis's secretary, dictated those terms to her, and had her read them back to him and fax him the signed agreement. Thus, the jury could have believed that for the $13,000 he paid to Davis, Wasserson thought he could wash his hands of the trash, debris, and hazardous waste in his warehouse, and leave Davis "holding the bag."

As Wasserson knew, the warehouse that Davis agreed to clean was quite large, and the amount of debris and waste was significant. The areas to be cleaned included about 125 multi-drawer filing cabinets full of old papers and trash, plastic pipe, long crates, old machinery, old safes, about 500 multiple tier racks and three "huge" filters; and then there was the hazardous waste. A reasonable jury could conclude from this evidence that Wasserson's only concern regarding the hazardous waste was shifting legal responsibility to Davis.

■ Accordingly, it was reasonable for the jury to conclude that Wasserson knew that the hazardous wastes might well be disposed of at an unpermitted facility, or at least that he was willfully blind to that eventuality.[9] *See United States v. Hayes International Corp.*, 786 F.2d 1499, 1504 (11th Cir.1986) ("It is common knowledge that properly disposing of wastes in an expensive task, and if someone is willing to take away wastes at an unusual price or under unusual circumstances, then a juror can infer that the transporter knows the wastes are not being taken to a permit facility.").

For all of these reasons, we find that there is more than sufficient evidence to support the unlawful disposal conviction. Accordingly, we will reverse the district court's order granting judgment of acquittal on Count Three and reinstate the jury's verdict of guilty.

■ One matter remains. As we have noted, the district court granted Wasserson a new trial on Counts One and Two (the transportation violations) because the charge did not properly inform the jury of the knowledge required for conviction. At oral argument, we inquired about the jury instructions on Count Three (the disposal violation) with respect to the knowledge requirement. The government responded by contending that Wasserson has waived any right to a new trial based on any error in the instruction on Count Three by not filing a cross-appeal from the district court's order. However, we suggested that it would be somewhat irrational for Wasserson to cross-appeal and request a new trial when he had prevailed on his motion for judgment of acquittal.

During his oral argument, Wasserson's counsel did claim that the Count Three jury instruction on the knowledge requirement was error, and he explained that he did not file a cross-appeal on that issue because he had won a judgment of acquittal.

■ That is a somewhat revisionist view of what happened. Although Wasserson's trial counsel objected to the instruction on Counts One and Two because they omitted the knowledge requirement, he did not object to the instruction on Count Three on that, or any other, basis. In addition, Wasserson did not file a post-trial

9. Wasserson argues that there is insufficient evidence that he knew that the hazardous waste would be disposed of unlawfully. How- ever, as noted, *supra*, "willful blindness is a subjective state of mind that is deemed to satisfy a scienter requirement of knowledge."

motion for a new trial based on a claim that the Count Three instruction omitted the knowledge requirement.[10] Moreover, the brief he submitted to us does not mention any claimed error in the Count Three jury instruction. Accordingly, Wasserson has waived any right to challenge the instruction given on Count Three. *See Montrose Medical Group Participating Savings Plan v. Bulger*, 243 F.3d 773, 783 (3d Cir.2001) (an issue presented for the first time of appeal is waived).

## III. Conclusion

For the reasons set forth above, the ordering granting Wasserson's motion for judgment of acquittal on Count III is reversed, and the jury's verdict on Count three will be reinstated.

---

**10.** Wasserson did file a motion for a new trial on Count III based on his claim that a willful blindness instruction should not have been given. We note, however, that in granting the motion for judgment of acquittal, the district court overlooked the conditional ruling requirements of Fed.R.Crim.P. 29(d). Rule 29(d) provides:

If the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed. The court must specify the reasons for that determination.

A district court's failure to make a conditional ruling constitutes error. *United States v. Kellington*, 217 F.3d 1084, 1096 (9th Cir.2000). "The purpose of requiring a condition ruling is judicial economy." *Id.* " 'Rather than have the judgment of acquittal and the grant of a

new trial be reviewed separately by the appeals court, [Rule 29(d) ] requires the district judge to make a conditional ruling concerning a new trial so that the appeals court can review these decisions in a single consolidated appeal.' " *Id.* (quoting Richard Sauber & Michael Waldman, *Unlimited Power: Rule 29(a) and the Unreviewability of Directed Judgments of Acquittal*, 44 Am. U.L.Rev. 433, 437–38 (1994)).

However, neither the government nor Wasserson brought the error to the district court's attention. And, neither party has raised the issue in their briefs. Nonetheless, we believe that the district court's failure to comply with Rule 29(d) is of no real consequence because Wasserson did not pursue the claim on appeal that a willful blindness instruction should not have been given. Consequently, he has abandoned it.