

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-18-2000

# United States v. Wert-Ruiz

Precedential or Non-Precedential:

Docket 99-5332

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"United States v. Wert-Ruiz" (2000). *2000 Decisions.* Paper 201.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/201

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 18, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 99-5332

UNITED STATES OF AMERICA

v.

SANDRA WERT-RUIZ, a/k/a THE LADY
Sandra Wert-Ruiz, Appellant

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Crim. No. 96-00073-8)
District Judge: Honorable Dickinson R. Debevoise

Argued: April 24, 2000

Before: BECKER, Chief Judge, WEIS and
OAKES,* Circuit Judges.

(Filed: September 18, 2000)

      EDNA B. AXELROD, ESQUIRE
       (ARGUED)
      76 South Orange Avenue, Suite 305
      South Orange, NJ 07079

Counsel for Appellant

_____

* Honorable James L. Oakes, United States Circuit Judge for the Second
Circuit, sitting by designation.

ROBERT J. CLEARY, ESQUIRE
United States Attorney
GEORGE S. LEONE, ESQUIRE
Assistant United States Attorney
970 Broad Street, Room 700
Newark, NJ 07102

NORMAN J. GROSS, ESQUIRE
 (ARGUED)
Assistant United States Attorney
United States Federal Building and
 United States Courthouse
401 Market Street, Fourth Floor
Camden, NJ 08101-2098

Counsel for Appellee

OPINION OF THE COURT

BECKER, Chief Judge.

Sandra Wert-Ruiz, the operator of a check cashing and money remitting agency, appeals her conviction for taking part in a conspiracy to launder drug money in violation of 18 U.S.C. S 1956(h). The District Court gave a willful blindness charge--informing the jurors that they could convict Wert-Ruiz if they concluded that she had deliberately avoided learning that she was dealing with the proceeds of illegal activity and that the transactions were designed to conceal or disguise the nature or source of those funds. Wert-Ruiz argues on appeal that: (1) there was sufficient evidence to support a jury conclusion that she had actual knowledge of the illegal source of the laundered money, but not that she had willfully blinded herself to the funds' origin; and (2) the District Court therefore should not have given a willful blindness charge. We agree that there was sufficient evidence of actual knowledge, but note that the jury might have credited only portions of the government's evidence and concluded that willful blindness was afoot. Because there was sufficient evidence from which a jury could find willful blindness, we hold that the District Court properly charged the jury. We will therefore affirm Wert-Ruiz's conviction.

2

In reaching our conclusion, we reject Wert–Ruiz's subtle contention that so long as there is sufficient evidence of actual knowledge, a willful blindness charge is at all events inappropriate. Rather, we follow our holding in United States v. Stewart, 185 F.3d 112, 126 (3d Cir. 1999), that, assuming there to be sufficient evidence as to both theories, it is not inconsistent for a court to give a charge on both willful blindness and actual knowledge. This is so because, if the jury does not find the existence of actual knowledge, it might still find that the facts support a finding of willful blindness. In view of our conclusion, we need not reach the government's alternative contention that an erroneous giving of a willful blindness instruction is per se harmless error.[1]

I.

Sandra Wert–Ruiz earned a medical degree in the Dominican Republic. In 1986, she and her husband, Franklin Ruiz, moved to the United States. Wert–Ruiz became a United States citizen in 1989. In 1991, Wert–Ruiz and her husband opened S&F Check Cashing and S&F Associates. S&F 's main office was in West New York, New Jersey, and was managed by Wert–Ruiz, while Franklin

_____

1. Wert–Ruiz makes a number of additional arguments that we dispose of summarily. She asserts that the prosecutor made improper remarks during closing arguments on rebuttal. Because Wert–Ruiz's trial attorney failed to object to these statements, we review them only for plain error and conclude that they fail to rise to that level. Wert–Ruiz also objects to
other statements made in the rebuttal that allegedly implied that she and her counsel had colluded to produce false evidence at trial. Having reviewed the statements, we do not find a clear implication of such conduct. At all events, Wert–Ruiz's attorney objected, the District Court gave a cautionary instruction afterwards, and defense counsel did not request a further remedy. Under the circumstances, we find no constitutional error. We also conclude, contrary to Wert–Ruiz's arguments, that she was not prejudiced by the government's purported incorporation of evidence into leading questions and that the government did not improperly vouch for Angel Rayo's credibility and bolster his testimony. Finally, in light of the preceding, we conclude that there was not an accumulation of errors that combined to deprive Wert–Ruiz of a fair trial.

Ruiz managed a branch in Guttenberg, New Jersey. S&F Check Cashing only handled check cashing services, whereas S&F Associates provided additional services such as money orders, Western Union transmittals, bill payments, and phone card sales. Wert-Ruiz testified that the businesses were dealing with millions of dollars annually, which included moving thirteen million dollars through Western Union money transmittals and over twenty-one million dollars through check cashing activities in 1994 alone.

In 1994, Wert-Ruiz's portion of the business became involved in laundering drug money. The conspiracy touched Wert-Ruiz through the business of money remitting, which is a legitimate financial service used to send funds from one country to another. In a typical money remitting transaction an individual gives cash to a remitting agency in one country with direction that an individual in another country be paid. The remitter contacts a similar agency in the transferee country, provides the name of the funds' intended recipient, and transmits the funds. The recipient then collects the money from the transferee agency. Because the funds entering the remitting system are in the currency of the transferor country while those paid out are in the currency of the transferee, the tangible moneys received by the transferor remitting agency are not sent directly to the end recipient. Instead, they are sold to parties who need that particular currency to conduct their business (such as importers in foreign nations) in exchange for the currencies needed to pay out the remittances.

Money remitting provides an avenue for placing currency into the banking system, making it a mechanism through which illegally obtained funds (like those acquired through drug trafficking) may be laundered. False receipts generated to record false remitting transactions create a paper trail indicating that money sent abroad is "clean," when in fact the foreign agency gives the transferred funds to the drug traffickers. Transactions of this nature were at the heart of the case against Wert-Ruiz. While there were no allegations that Wert-Ruiz was in any way involved with the actual sale of illicit drugs, federal prosecutors contended that she was a participant in a conspiracy to use her business to launder drug money.

4

Wert-Ruiz's involvement with money launderers arose in connection with an ongoing operation of Fabio Castro and Angel Rayo, the owners of a money remitting service known as International Services. In addition to conducting legitimate transactions, International Services was laundering drug money. Because the volume of transfers handled by International Services was potentially large enough to attract the attention of law enforcement, Rayo sought another agency to handle money transfers and asked Wert-Ruiz to become an agent of International Services. According to the government's evidence, Wert-Ruiz participated in the money laundering conspiracy by generating false receipts designed to conceal transfers of money. Specifically, drug trafficking proceeds were delivered in cash form to Wert-Ruiz, who then prepared or directed the preparation of false remitting receipts. These efforts, in turn, created a paper trail that suggested that the money was entering the banking system through legitimate channels.

After a time, Wert-Ruiz obtained her own license to function as a remitter, and began operating through a new corporation she formed named Latin American Services ("LAS"). Wert-Ruiz continued to receive money acquired through drug trafficking--often packed inside of gym bags --and continued to prepare fraudulent receipts.

At the time of trial, Castro was a fugitive. Rayo testified on behalf of the government under a plea agreement. Wert-Ruiz did not dispute that money had been laundered through her business, but she denied knowing anything about the other conspirators' intentions. The government presented evidence that Wert-Ruiz and her employees handwrote thousands of fictitious receipts for cash delivered to LAS that was supposedly going to individuals in the Dominican Republic. The government presented expert testimony that Wert-Ruiz attempted to disguise her handwriting in preparing these receipts. Investigators testified that out of a sample of well over one hundred receipts seized from Wert-Ruiz, they had been unable to find a single person identified on any of the receipts, indicating that the receipts were false. At trial, Wert-Ruiz testified that she had prepared the forged receipts from

5

actual receipts provided by International Services that purportedly reflected real transactions. These latter receipts were not produced at trial, and the government presented evidence that Wert-Ruiz had never admitted to writing the forged LAS receipts during interviews with law enforcement officials conducted after her arrest but before trial.

Additional evidence established that the conspirators used codes in conducting phone conversations about aspects of the conspiracy. Though Wert-Ruiz was not privy to many of the codes, she knew that the conspirators used the word "tarjetas" (Spanish for "cards") to mean money, and she was aware of their practice of dropping zeros when discussing sums of money, thus describing $10,000 as $1,000.

A jury convicted Wert-Ruiz of violating 18 U.S.C. S 1956(h) (conspiracy to commit money laundering).2 She

_____

2. The statute provides that "[a]ny person who conspires to commit any offense defined in this section . . . shall be subject to the same penalties
as those prescribed for the offense the commission of which was the object of the conspiracy." Id. The relevant portion of the money laundering statute implicated by this clause is 18 U.S.C. S 1956(a)(1), which provides for liability for:

> Whoever, knowing that the property involved in afinancial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such afinancial transaction which in fact involves the proceeds of specified unlawful
> activity--
>
> (A)(i) with the intent to promote the carrying on of specified unlawful activity; or
>
> (ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or
>
> (B) knowing that the transaction is designed in whole or in part--
>
> (i) to conceal or disguise the nature, the location, the source, the
> ownership, or the control of the proceeds of specified unlawful activity; or
>
> (ii) to avoid a transaction reporting requirement under State or Federal law[.]

The statute provides a list of offenses that qualify as "specified
unlawful
activity," among them the sale or distribution of controlled substances.

6

received a six-year prison sentence and filed a timely notice of appeal. The District Court had jurisdiction under 18 U.S.C. S 3231. We have appellate jurisdiction under 28 U.S.C. S 1291.

II.

At trial, the District Court instructed the jury on the issue of willful blindness as follows:

> When knowledge of the existence of a particular fact is an essential part of an offense, such knowledge may be established if a defendant is aware of a high probability of its existence, unless she actually believes that it does not exist.
>
> So with respect to the issue of a defendant's knowledge in this case, if you find from all the evidence beyond a reasonable doubt that the defendant deliberately and consciously tried to avoid learning that certain currency was the proceeds of some form of illegal activity, and that the defendants deliberately and consciously tried to avoid learning that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the proceeds of the unlawful activity, you may treat such deliberate avoidance of positive knowledge as the equivalent of knowledge.
>
> I must emphasize, however, that the requisite proof of knowledge on the part of a defendant cannot be established by demonstrating she was negligent, careless or foolish.

---

See id. S 1956(c)(7). Though knowledge that the funds have been obtained illegally is required, knowledge of what the specified unlawful activity is is not, for the statute defines "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" as meaning that the person involved "knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign law, regardless of whether or not such activity is specified in paragraph (7) [which defines the specified unlawful activities]." Id. S (c)(1)."

7

Wert–Ruiz argues that the government adduced evidence only of her actual knowledge of the conspiracy and its objects, and that there was insufficient evidence of willful blindness to allow a jury to conclude that she had deliberately avoided learning about the illegal activities for which her business was used. Because such evidence was absent, the argument continues, the instruction was unjustified, and had the effect of diluting the government's burden of proof by creating the risk of convicting Wert–Ruiz if the jury concluded that she merely should have known about the criminal activities. See United States v. Hilliard, 31 F.3d 1509, 1517 (10th Cir. 1994).

Our review of a challenge to the propriety of the willful blindness instruction is plenary. See United States v. Stewart, 185 F.3d 112, 126 (3d Cir. 1999). In evaluating the charge, we view the evidence and the inferences drawn therefrom in the light most favorable to the government. See United States v. Sharpe, 193 F.3d 852, 871 (5th Cir. 1999).

A.

A willful blindness instruction is often described as sounding in "deliberate ignorance." See United States v. One 1973 Rolls Royce, 43 F.3d 794, 807–08 (3d Cir. 1994). Such instructions must be tailored, as the District Court's was here, to avoid the implication that a defendant may be convicted simply because he or she should have known of facts of which he or she was unaware. Willful blindness is not to be equated with negligence or a lack of due care, see id. at 809 n.13, for "willful blindness is a subjective state of mind that is deemed to satisfy a scienter requirement of knowledge," id. at 808. The instruction "must make clear that the defendant himself was subjectively aware of the high probability of the fact in question, and not merely that a reasonable man would have been aware of the probability." United States v. Caminos, 770 F.2d 361, 365 (3d Cir. 1985). If such a charge is supported by sufficient evidence, it is not inconsistent for a court to give a charge on both willful blindness and actual knowledge, for if the jury does not find the existence of actual knowledge, it

8

might still find willful blindness. See United States v. Stewart, 185 F.3d 112, 126 (3d Cir. 1999).

Wert-Ruiz does not challenge the legal adequacy of the instruction as it was worded, but rather the propriety of giving it under the circumstances of her case.3 She urges that there was insufficient evidence of willful blindness to justify the instruction.

B.

Wert-Ruiz concedes that there was sufficient evidence to convict her of knowingly participating in the conspiracy. As noted above, however, she maintains that none of the government's evidence supported a willful blindness instruction. Wert-Ruiz contends that each piece of the government's evidence can be interpreted in only one of two ways: either she was a knowing participant in the conspiracy (if the government's evidence is believed) or she was an unknowing innocent who became ensnared in it (if the government's evidence is not believed). Mindful that we must interpret each piece of evidence (and draw all supportable inferences) in favor of the government, and mindful that the jury was entitled to decide that only part of the government's evidence was credible, we conclude that Wert-Ruiz's challenge must fail.

_____

3. Wert-Ruiz does, however, make an additional legal challenge to the instruction. She argues that the instruction was error under the circumstances because it is impossible to be willfully blind to participation in a conspiracy. Citing United States v. Scotti, 47 F.3d 1237
(2d Cir. 1995), she maintains that it is "logically impossible for a defendant to intend and agree to join a conspiracy if [s]he does not know that it exists." Id. at 1243. This contention flounders on our ruling to the
contrary in United States v. Anderskow, 88 F.3d 245, 254 (3d Cir. 1996), which affirmed a conspiracy conviction where "the jury had ample evidence with which to conclude that, at a minimum,[the defendant] had willfully blinded himself to the fact that" a criminal conspiracy existed.

9

1.

a.

Wert-Ruiz first points to the testimony of Angel Rayo. At trial Rayo claimed to have recruited Wert-Ruiz to participate in illegal laundering activities. Rayo testified through an interpreter that he recruited Wert-Ruiz to pose as an agent of International Services by specifically asking her to engage in activities to support the "illegal aspects" of International Services' transactions, stating "I also propose is that she do appear as an agent where transfers would be done that were not real in order to support the illegal aspects of International Services." Rayo also testified that Wert-Ruiz subsequently generated false receipts for nonexistent money remitting transactions to create a paper trail that would make sending drug money abroad appear legal.

Wert-Ruiz characterizes each of these portions of Rayo's testimony as evidence of actual knowledge, but not willful blindness. It is true that a jury could find from this evidence that Wert-Ruiz knew she was participating in a conspiracy to launder funds that had been generated by illegal activities. It is essential, however, to remember the precise contours of the instruction. The District Court specifically focused the willful blindness instruction on the source of the laundered funds and the purpose of the transactions in which she engaged. To be sure, the evidence recounted above, if believed by the jury, could have been used to conclude that Wert-Ruiz knew the illegal source of the money and the precise purpose of her activities. The evidence is not, however, inconsistent with the conduct of an individual who willfully blinded herself from the source of the funds with which she dealt and the nature of those activities.

"Illegal aspects" (the wording employed by Rayo in his testimony) is a vague term, encompassing a range of activities that may not have involved the laundering of drug money. Wert-Ruiz could have knowingly generated the false receipts in exchange for the commissions she received while willfully blinding herself to the source of the cash or the

10

purpose of the transactions even if she knew her activities had "illegal aspects." Indeed, Rayo himself testified that he had been willfully blind about the funds that he was laundering for quite some time. When asked what he understood about the source of the funds, he stated"I never asked the question. The truth is I did not want to know." Similarly, Rayo testified that Wert-Ruiz never asked him about the source of the money that she would be transferring. A jury could have credited both Wert-Ruiz's denial of knowledge and the evidence of her participation in the concealment activities, concluding that the reason that Wert-Ruiz did not know of the source of the illicit funds was her deliberate ignorance of the circumstances surrounding her activities. Willful blindness instructions have previously been upheld under similar circumstances. See United States v. Gonzales, 90 F.3d 1363, 1371 (8th Cir. 1996) (upholding willful blindness instruction where the defendants, who were charged with laundering drug money, failed to inquire about the source of the money and used incorrect names and addresses on documents when wiring money).

In short, a jury could have credited Rayo's testimony as implying that Wert-Ruiz knew that she was being invited to engage in activities designed to conceal the source of certain moneys without being specifically told the source of the funds. The fact that Wert-Ruiz did not ask the natural follow-up question to determine the source of those funds could be reasonably considered by a jury to be evidence of willful blindness, especially when combined with the additional evidence discussed below.

Finally, we must remember that the jury was entitled to disbelieve all or part of Rayo's testimony. Thus, even if we were to agree with Wert-Ruiz that Rayo's testimony only supports a finding of actual knowledge, there was other evidence in the record on which a jury could have relied to find that Wert-Ruiz had willfully blinded herself to the illegal source of the funds she was transferring.

b.

Wert-Ruiz points also to the testimony of Yuri Acosta, who testified that he delivered bags of money to Wert-Ruiz

11

and claimed that Wert-Ruiz advised him that, if he were ever caught with the funds, he should say that he was bringing money from International Services or another cashier. Wert-Ruiz claims that this is evidence of knowledge of illegality. Again, in our view, the evidence indicates knowledge of concealment, but is not exclusively evidence of knowledge of the illicit source of the money. In light of Wert-Ruiz's denial that she ever knew the illegal source of the funds, a jury could accept the denial and conclude that her conduct evidenced willful blindness. Further, as with Rayo's testimony, because the jury could selectively discredit some of the evidence in the prosecution's case, the existence of evidence that points to actual knowledge does not preclude consideration of other evidence that points to a finding that Wert-Ruiz was wilfully blind to the source of the drug money.

c.

The ability of the jury to have discounted aspects of the government's case is important in light of the last piece of evidence that, according to Wert-Ruiz, demonstrates that her culpability was either knowing or innocent, but not deliberately ignorant. After Wert-Ruiz's arrest, she spoke to a customs agent who testified that Wert-Ruiz described her activities and admitted that she received bags of money in such large volume that she herself was suspicious about it. The agent testified that after he asked her if she thought the money came from the sale of narcotics, "[Wert-Ruiz] replied that she was an educated woman, and where else would money come from in that amount."

This statement, if credited by the jury, would indeed suggest actual knowledge and not willful blindness. Still, in juxtaposition with Wert-Ruiz's claims at trial not to have known the source of the funds, it could arguably be viewed as an example of willful blindness--in other words, she never asked questions while participating in the conspiracy, but when the truth was revealed she was not at all surprised about what really had happened.

2.

Wert-Ruiz further claims that the government's summation confirms that the evidence previously recounted

12

pertained only to actual knowledge. We do not agree. She bases her argument on segments of the summation where the prosecution emphasized Rayo's testimony that he told Wert-Ruiz that she would be a pretend agent for International Services and the evidence that Wert-Ruiz created fake receipts for transactions that never took place. Again, we do not believe this evidence supports only an actual knowledge charge, as it could be taken to demonstrate either that Wert-Ruiz figured out that the funds with which she was dealing came from an illegal source or that she willfully avoided drawing that inference and therefore never "knew" that to be the case. Moreover, as Wert-Ruiz concedes, the government did indeed argue that even if the jury accepted some of the defendant's arguments, the evidence indicated that she still"clos[ed her] eyes to what was obviously illegal."

3.

Even if some of the evidence discussed above tends to be consistent only with a finding of actual knowledge, the government presented ample additional evidence from which a reasonable inference of willful blindness could be drawn. The government points out that evidence was introduced demonstrating that Wert-Ruiz knew that in many of the transactions the co-conspirators would refer to large dollar amounts by dropping digits, but still she did not raise questions as to this practice. Similarly, there is evidence that she and members of the conspiracy would refer to money by the code word "tarjetas" (the Spanish word for cards). A reasonable jury, having discounted evidence of Wert-Ruiz's actual knowledge of the conspiracy or its objects, could rationally conclude that the practice of using code words for transactions and minimizing dollar amounts--not to mention her receipt of large amounts of cash in gym bags--must have alerted her to the possibility that her money transfer activities were actually in service of a money laundering operation, and that her failure to inquire further evinced willful blindness. This is not to say that Wert-Ruiz did not proffer alternative explanations, but the verdict indicates that the jury did not credit them. Because the evidence supports that verdict, we will not second guess that decision.

13

III.

Failing to uphold the District Court's instruction under these facts could carry harmful results. There was little direct evidence that Wert-Ruiz specifically knew that she was helping to launder the proceeds of illegal activity--most of the evidence in this regard was circumstantial. It would seem that a reasonable person could have drawn few other conclusions given the nature of the transactions, yet Wert-Ruiz claimed not to have known that she was engaging in money laundering activity. If Wert-Ruiz deliberately avoided learning the source of the funds, she could have honestly claimed to have lacked knowledge. In this light, a willful blindness instruction served the important purpose of preventing Wert-Ruiz from evading culpability if the jury concluded that due to a willful refusal to connect the dots, Wert-Ruiz actually did not know of the purposes of her money laundering activities. See United States v. Sharma, 190 F.3d 220, 231 (3d Cir. 1999) (approving instruction when jury could have inferred the defendant's lack of knowledge, and the willful blindness instruction"ensured that a juror who believed that a defendant turned a blind eye toward his co-defendant's conduct would not vote to acquit the willfully blind defendant"). Deliberate ignorance cannot become a safe harbor for culpable conduct.

In sum, we conclude that a reasonable jury could have concluded that Wert-Ruiz deliberately avoided learning about the source of the enterprise's funds. Because we so hold, there is no need to address the government's contention that the giving of a willful blindness instruction when there is insufficient evidence of the same is per se harmless error. The judgment of the District Court will be affirmed.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

14