

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-26-2006

# USA v. Oppong

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-4112

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"USA v. Oppong" (2006). *2006 Decisions.* Paper 1713.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1713

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 03-4112
_____


UNITED STATES

v.

FELIX YAW OPPONG,
                    Appellant
_____


On Appeal from the United States District Court
for the District of New Jersey
(District of New Jersey Criminal No. 02-455-2)

District Judge: The Honorable Mary L. Cooper
_____

No. 03-4378
_____
UNITED STATES

v.

JOE MENSAH,
                    Appellant
_____


On Appeal from the United States District Court
for the District of New Jersey
(District of New Jersey Criminal No. 02-455-1)


1

District Judge: The Honorable Mary L. Cooper


Submitted under Third Circuit LAR 34.1(a) – November 15, 2005
_____


Before: BARRY and AMBRO, Circuit Judges,
and POLLAK,[*] District Judge.


_____


(Opinion Filed:  January 26, 2006)
_____

OPINION
_____

POLLAK, District Judge:

Defendants-appellants Felix Yaw Oppong and Joe Mensah were convicted on drug

conspiracy charges and subsequently sentenced in the United States District Court for the

District of New Jersey.  They now timely appeal from those final judgments.

Mr. Oppong and Mr. Mensah were charged in a two-count indictment with

conspiracy to distribute and to possess with intent to distribute more than five kilograms

of cocaine, and with conspiracy to export more than five kilograms of cocaine.  The

District Court found that Mr. Oppong voluntarily waived his *Miranda* rights and therefore

denied Mr. Oppong's motion to suppress his post-arrest statement to the police.  The

District Court also denied defendants' motions to dismiss the indictment based on

_____

[*] Honorable Louis H. Pollak, District Judge for the United States District Court of
the Eastern District of Pennsylvania, sitting by designation.

claimed withdrawal from the conspiracy before the limitations period.  In March 2003, a jury found Mr. Oppong and Mr. Mensah guilty on both counts.  They were sentenced in October 2003, prior to *United States v. Booker*, 543 U.S. 220 (2005).

## I.

Mr. Oppong raises several challenges to his conviction based on (1) his identification by a witness; (2) the admission of his post-arrest statement and the exclusion of additional evidence from the District Court's suppression hearing; and (3) the jury's determination that he did not withdraw from the conspiracy.  Mr. Mensah challenges the "willful blindness" instruction given to the jury regarding the knowledge element of the conspiracy charges against him.  We find these challenges meritless and will affirm both convictions.  We will, however, remand for resentencing, in accordance with our practice with respect to sentences imposed prior to *Booker*.  *See, e.g.*, *United States v. Benjamin*, 125 Fed. Appx. 438, 2005 WL 546647 (3d Cir. Mar. 9, 2005).

### A. Appellant Oppong's Claims

#### 1. Witness identification

Ramon Ramos was involved in the supply of cocaine to the drug trafficking conspiracy in which Mr. Oppong and Mr. Mensah were convicted of participating.  Mr. Ramos was arrested in July 1999 and entered into a cooperation agreement with the Government in 2000.  He testified against the appellants.  At the time, Mr. Ramos was awaiting sentencing by the New York courts.

Before trial, the Government informed defense counsel that Mr. Ramos positively

3

identified photographs of a number of alleged conspirators, but did not positively identify photographs of Mr. Oppong or Mr. Mensah.

Prior to Mr. Ramos's in-court testimony, the Government learned that Mr. Ramos had seen Mr. Oppong in the courthouse lock-up and recognized him as a former business-mate. The Government disclosed this information to counsel, adding that Mr. Ramos was prepared to identify Mr. Oppong in court. The Government further explained that Mr. Ramos had not previously made a positive identification of Oppong, but had "indicated that a photograph [of Mr. Oppong] looked like the person named Cuaco that he had dealt with." Trial Tr., App. at 750; *see also id.* at 857-858.

In court, Mr. Ramos testified to this earlier, tentative identification of a man in a photograph as "Cuaco" and then proceeded to identify Mr. Oppong as Cuaco. Mr. Ramos's testimony during both direct examination and cross-examination emphasized the tentative nature of his photo identification of Cuaco. *See* Trial Tr., App. at 865-66 (direct examination); 8787-79 (cross-examination).

Defense counsel objected that this testimony contradicted the Government's pre-trial representation that Mr. Ramos did not positively identify photographs of the defendants. The District Court overruled this objection. In so finding, the District Court distinguished between "positive" and "tentative" identifications; both the Government and the District Court characterized Mr. Ramos's photo identification as merely tentative. *See, e.g.*, Trial Tr., App. at 861, 863, 2942.

On appeal, Mr. Oppong argues that the Government engaged in a "blatant *Giglio*

4

violation" when it stated in a letter to defense counsel that Mr. Ramos did not positively

identify Mr. Oppong.  *Cf. Giglio v. United States*, 405 U.S. 150 (1972); *Brady v.*

*Maryland*, 373 U.S. 83 (1963).  Mr. Oppong maintains that the District Court, in order to

sanction the Government, should have suppressed Mr. Ramos's testimony regarding his

prior tentative photo identification of Mr. Oppong (as Cuaco).  The crux of Mr. Oppong's

claim is that the Government "intentionally gave [him] the misleading impression that

Ramos had not previously identified [him] from a photo array," causing his counsel to be

"unfairly surprised" at trial by Mr. Ramos's testimony.  Oppong Br. at 63.  Although

defense counsel refers to this as a*"Giglio* violation,"[1] it does not fulfill the basic criteria

for either a *Giglio* or *Brady* violation.  In both cases, the Supreme Court sought to avoid

prejudicing the accused by requiring that favorable evidence—either for exculpatory or

impeachment purposes—be disclosed.  *See Giglio*, 405 U.S. at 151, 154 (finding a *Brady*-

type due process violation when the government suppressed material evidence of a

leniency agreement with an accomplice witness); *Brady*, 373 U.S. at 87 (holding that

suppression by the prosecution of material evidence favorable to and requested by the

accused violates due process).

Mr. Oppong's complaint is *not* that favorable material evidence was not

---

[1] The Government argues that during the trial Mr. Oppong's counsel expressly stated that he was not claiming a *Giglio* violation, and therefore any such argument was waived. However, after reviewing the record, we conclude that the colloquy between the judge and defense counsel was not sufficiently unambiguous as to constitute such a waiver. Trial Tr., App. at 861-62.

disclosed—but rather that evidence, which ultimately was not entirely favorable to him, was disclosed in such a way that defense counsel may have anticipated that it would be entirely favorable. Specifically, Mr. Oppong asks this court to conclude that the District Court abused its discretion when it admitted testimony regarding Mr. Ramos's tentative photo identification of Mr. Oppong, despite the Government's earlier representation that Mr. Ramos did not positively identify Mr. Oppong.[2] *Cf.* Trial Tr., App. at 863.

We cannot so conclude in this case. We have previously acknowledged the distinction between tentative and positive identifications. *See*, *e.g.*, *Baker v. Barbo*, 177 F.3d 149, 156 (3d Cir. 1999) (describing a victim's initial photo identification of the defendant as tentative, while the in-court identification was definitive); *Landano v. Rafferty*, 856 F.2d 569, 574 (3d Cir. 1988) (describing conflicting characterizations of an out-of-court identification as either tentative or positive); *United States v. Gaines*, 450 F.2d 186, 195, 198 (3d Cir. 1971) (noting that the witness initially tentatively identified the defendant but was unable to provide a positive identification). Moreover, we note that there is no general constitutional right to discovery in criminal cases. *See Weatherford v. Bursey*, 429 U.S. 545, 559 (1977); *see also* Fed. R. Crim. P. 16(a) (identifying categories of evidence that must be disclosed before trial). Further, the Government fully disclosed,

---

[2] Mr. Ramos's tentative identification of Mr. Oppong cannot be classified as exculpatory. In addition, Mr. Oppong does not present any way in which the tentative identification reflects upon Mr. Ramos's credibility or could be used for impeachment purposes. *Cf. Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (finding due process violation only where government's non-disclosure of evidence undermines confidence in trial outcome).

6

prior to Mr. Ramos's testimony, that Mr. Ramos had "indicated that a photograph [of Mr. Oppong] looked like the person named Cuaco that he had dealt with." Trial Tr., App. at 750. There is no reason to believe that Mr. Oppong's counsel would have conducted his case any differently if this information had been provided earlier. *Cf. United States v. Higgs*, 713 F.2d 39, 44 (3d Cir. 1983).

Mr. Oppong also claims that Mr. Ramos's in-court identification was tainted by the fact that the two men had a chance encounter in lock-up. Mr. Oppong has not shown, however, that the encounter was "so unnecessarily suggestive as to give rise to such a substantial likelihood of irreparable misidentification that admitting the identification testimony [was] a denial of due process." *United States v. Clausen*, 328 F. 3d 708, 713 (3d Cir. 2003); *see also United States v. Emanuele*, 51 F.3d 1123, 1129 (3d Cir. 1995).

In sum, we find that the District Court's decisions to admit Mr. Ramos's testimony regarding his tentative photo identification of Mr. Oppong and to allow Mr. Ramos's in-court identification of Mr. Oppong did not constitute abuse of discretion.

2. Admissibility of evidence

The District Court found that Mr. Oppong properly received his *Miranda* warning and voluntarily waived the rights enumerated therein. We have plenary review of the ultimate question of the voluntariness of Mr. Oppong's *Miranda* waiver, but we only review the District Court's factual findings for clear error. *See United States v. Pruden*, 398 F.3d 241 (3d Cir. 2005).

The District Court held a pre-trial evidentiary suppression hearing to determine the

7

admissibility of Mr. Oppong's post-arrest statement. Mr. Oppong and various United States Customs Agents ("Agents") involved in the arrest testified. It is undisputed that no *Miranda* warning was administered to Mr. Oppong until approximately four hours after he was arrested and after he had had multiple encounters with Agents. According to Mr. Oppong's brief, consistent and undisputed testimony established the following: after he was arrested, Mr. Oppong was placed in a holding cell. Two Agents entered the cell and advised Mr. Oppong, in detail, of the charges against him, of evidence acquired during the investigation implicating him, and of potential penalties. Mr. Oppong was allegedly told to think about what he had been told. Approximately two hours later, the Agents re-entered and advised Mr. Oppong of his *Miranda* rights. At that point he signed a waiver and gave a statement.

In arguing that his post-arrest statement should have been suppressed, Mr. Oppong relies principally on *Missouri v. Seibert*, 542 U.S. 600 (2004), in which the Supreme Court held that the police's deliberate withholding of *Miranda* warnings while engaged in preliminary interrogation was unconstitutional. In *Seibert*, the defendant made an unwarned confession, shortly followed by a warned confession. The Supreme Court held that neither confession was admissible. The Court reasoned that the police technique was improper because it was intended to elicit the suspect's waiver by reading the *Miranda* rights at a time when a reasonable person "would not have understood them to convey a message that she retained a choice about *continuing* to talk." 542 U.S. at 617 (emphasis added).

8

The facts of *Seibert* differ markedly from the facts found by the District Court in the instant case.  Here, the Agents testified—and the District Court credited their testimony on these issues—that Mr. Oppong did not request an attorney, was not interrogated prior to receiving *Miranda* warnings, and did not make any statements prior to being advised of his rights.  The District Court's credibility assessment is substantiated and reveals no clear error.[3]

While Mr. Oppong acknowledges the substantial differences between the facts found by the District Court here and those in *Seibert*, he argues that by providing him with information about his arrest and then leaving him in the holding cell to "digest" it, the Agents engaged in an "objectionable 'question first and warn later' technique." Oppong Br. at 72.  However, the District Court reasonably determined, based on the record, that there was no formal questioning first.  We conclude, moreover, that the information provided to Mr. Oppong by the Agents and the manner in which it was offered did not constitute the "functional equivalent" of an interrogation.  *Cf. Rhode Island v. Innis*, 446 U.S. 291, 292 (1980) (holding that *"Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent"); *id.* at 294-95, 301-03.  There is no basis for rejecting the District

---

[3] The District Court found Mr. Oppong to be less credible than the Agents, in part because of his "prior misdemeanor conviction for a crime involving false swearing." Trial Tr., App. at 431; *see id.* 432-34.  The District Court also noted that the Agents' testimony was unanimous regarding the fact that Mr. Oppong was not interrogated and gave no pre-*Miranda* statement. *Id.* at 430.

9

Court's finding that the Agents' conduct did not elicit an incriminating response from Mr. Oppong. *Cf. United States v. Allen*, 247 F.3d 741, 765-66 (8th Cir. 2001) ("keeping a suspect informed of the progress of the investigation and the status of the charges against him should be encouraged rather than discouraged, so long as the communication is truthful, and is not designed, nor is it likely to elicit, an incriminating response"). Accordingly, we find no error in the District Court's determination that Mr. Oppong's post-arrest statement was admissible.

Relatedly, we reject Mr. Oppong's argument that he should have been allowed to offer testimony at the suppression hearing regarding a negative experience with the police in 1997. The pre-trial evidentiary suppression hearing discussed above began on January 28, 2003; it was re-opened for a second day, on February 5, 2003, so that the parties could further address factual conflicts in testimony concerning Mr. Oppong's time in custody. On the second day, defense counsel requested leave to recall Mr. Oppong to the stand to testify to this additional negative experience. Mr. Oppong argued that the proffered testimony was relevant to his state of mind at the time of his arrest for the instant charges, and affected his ability to make a voluntary, knowing, and intelligent waiver. The District Court, acting in its discretion, denied the request, finding that the testimony was outside the scope of issues to be addressed.[4] There is no proper basis for disapproving the

---

[4] In support of this ruling, the Government asserts that the proffered testimony could have been developed on the first day of the hearing and that similar evidence based on a 1999 arrest was elicited. The Government also argues that it would have been unfairly prejudiced had the testimony been permitted.

10

District Court's decision, as there is no indication of any abuse of discretion. *Cf. United States v. Skulsky*, 786 F.2d 558, 562 (3d Cir. 1986); *United States v. Somers*, 496 F.2d 723, 735 (3d Cir. 1974).

3. Jury determination regarding withdrawal

Mr. Oppong challenges the jury's verdict by arguing that the evidence was insufficient to support a conviction. "Our review of the sufficiency of the evidence after a conviction is 'highly deferential.'" *United States v. Hart*, 273 F.3d 363, 371 (3d Cir. 2001). We have plenary power to determine, after drawing all reasonable inferences in the light most favorable to the Government, whether the evidence would allow a rational jury to convict. *See id.* The jury's verdict must be upheld if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Dent*, 149 F.3d 180, 188 (3d Cir. 1998).

Mr. Oppong contends that he made a prima facie case of withdrawal by communicating his withdrawal to a co-conspirator and argues that the Government did not offer an adequate rebuttal. In *United States v. Steele*, we set out the requirements for a prima facie case of withdrawal: "defendant must present evidence of some affirmative act of withdrawal on his part, typically either a full confession to the authorities or communication to his co-conspirators that he has abandoned the enterprise and its goals." 685 F.2d 793, 803-04 (3d Cir. 1982). Mr. Oppong testified that he had a falling out with a co-conspirator, Mr. Kittoe, in April 1997 and made a statement to Mr. Kittoe that he wanted to cease his involvement in Mr. Kittoe's drug activities. *See* Trial Tr., App. at

11

4246-50. The Government argues, notwithstanding the District Court's finding to the contrary, that Mr. Oppong did not establish a prima facie case of withdrawal because his evidence was limited to his own testimony and was not sufficiently clear and unambiguous.

Assuming, as the District Court found, that Mr. Oppong succeeded in establishing a prima facie case, we nonetheless conclude that the Government offered a sufficient rebuttal. Therefore, after drawing reasonable inferences in favor of the Government, we must conclude that a reasonable jury could find that Mr. Oppong did not withdraw. Rebuttal may be achieved either by "impeaching the defendant's proof or by going forward with evidence of some conduct in furtherance of the conspiracy subsequent to the act of withdrawal." *United States v. Antar*, 53 F.3d 568, 582 (3d Cir. 1995) (internal quotation marks omitted). In the case at bar, the Government challenged Mr. Oppong's credibility, and offered testimony by Mr. Ramos as to Mr. Oppong's continuing involvement in the conspiracy. The cross-examination of Mr. Oppong and examination of one of the Customs Agents revealed a number of significant inconsistencies in Mr. Oppong's testimony, which could have indicated to a jury that his testimony was not credible. Combined with Mr. Oppong's prior conviction for lying, a reasonable jury could conclude that his withdrawal testimony had been impeached. There was also documentary evidence of phone calls on Mr. Oppong's cell phone that could reasonably imply support for the Government's position. Finally, the phone records could reasonably be understood to support Mr. Ramos's testimony regarding drug sales

12

involving Mr. Oppong, which occurred after his alleged withdrawal. For these reasons, we conclude that the evidence was sufficient to support Mr. Oppong's conviction.

## B. Appellant Mensah's Claim

Mr. Mensah argues that the District Court erred when it instructed the jury on the theory of "willful blindness" or "conscious avoidance" with regard to the conspiracy charges. Mr. Mensah argues that this case should be distinguished from those where we have upheld the giving of such an instruction, such as *United States v. Wert-Ruiz*, 228 F.3d 250 (3d Cir. 2000). He contends that "there was no factual predicate for the instruction, for neither defendant [denied] knowledge; they were instead denying participation." Mensah Br. at 21. Mr. Mensah also attacks the instruction as "legally imprecise verbal characterizations." *Id.*

The Government argues that (a) the instruction was proper, and (b) even if the evidence had not warranted a "willful blindness instruction" for Mr. Mensah, it was entitled to make such an argument for Mr. Oppong and to give the instruction in such a way that would "'not turn the spotlight on a single defendant.'" Government-Appellee's Brief at 67 (quoting *United States v. Brandon*, 17 F.3d 409, 453 (1st Cir. 1994) (finding that a general instruction of "willful blindness" was acceptable in multi-defendant case where it might only apply to one defendant)).

We have acknowledged that "willful blindness" may apply to conspiracy charges. *See, e.g.*, *Wert-Ruiz*, 228 F.3d at 255 n.3 (rejecting the notion that it is "logically impossible" to be willfully blind to a conspiracy charge). Mr. Mensah does not

13

meaningfully distinguish his case from others where this instruction was properly given. This court in *Wert-Ruiz* allowed a willful blindness instruction where, as here, the jury might have found actual, knowing participation in the conspiracy.

During Mr. Mensah's and Mr. Oppong's trial, the Government presented evidence of their ongoing knowledge and participation in the drug conspiracy. Mr. Mensah and Mr. Oppong admitted to some knowledge and participation in the conspiracy prior to their alleged respective withdrawals in January and April of 1997 (i.e., outside of the limitations period). The defendants did not, however, admit various facts alleged by the Government, pertaining to the relevant time period—for example, they testified that they were present at certain events (such as cocaine deliveries) but did not know these events were connected to the conspiracy; they testified to a variety of "innocent contacts" with co-conspirators after their supposed withdrawal. *See, e.g.*, Trial Tr., App. at 3903-05, 3926-29. Since a jury might credit or discredit the Government's evidence, and might believe the defendants' testimony that they were unaware of various facts, there were some questions as to the defendants' knowledge; therefore there was a predicate for a willful blindness charge.

Finally, the wording of the jury instructions was adequate. The court duplicated the language used in previous Third Circuit cases—*United States v. Titchell*, 261 F.3d 348, 351 (3d Cir. 2001); *United States v. Caminos*, 770 F.2d 361, 366 (3d Cir.

14

1985)—and satisfied the standard set out in *Wert-Ruiz*.[5]

In *Wert-Ruiz*, we warned that willful blindness instructions "must be tailored . . . to avoid the implication that a defendant may be convicted simply because he or she should have known of facts of which he or she was unaware." 228 F.3d at 255. Indeed, we noted that the instructions "'must make clear that the defendant himself was subjectively aware of the high probability of the fact in question, and not merely that a reasonable man would have been aware of the probability.'" *Id.* (quoting *Caminos*, 770 F.2d at 365). In this case, the judge extensively instructed the jury as to the requirements for finding

---

[5] The District Court here instructed:

> [T]he element of knowledge may be satisfied by inferences from the proof that the defendant deliberately closed his eyes to what otherwise would have been obvious to him. In other words, you may find such knowledge established if you find that the defendant was aware of the high probability of the existence of a fact and failed to take action to determine whether or not it was true. The defendant cannot be convicted for being stupid, negligent, or mistaken. More is required than that. The defendant's knowledge of a fact may be inferred from willful blindness to the existence of fact which indicate that there is a high probability that some forbidden or illegal activity is occurring. You may treat such deliberate avoidance . . . as the equivalent of knowledge. In short, if the evidence shows that the defendant did not know, then he must be acquitted. If the evidence indicates that he was very stupid in the actions that the took or ignorant, then he cannot be convicted. But if the evidence shows that there was a high probability that the defendant himself knew something was amiss and that he acted with deliberate disregard for a high probability that illegal activity was occurring, then you may find that the defendant had guilty knowledge which is required for the conviction of the offense charged.

Trial Tr., App. at 4737-38. Mr. Mensah argues that the final sentence of this instruction improperly diluted the "beyond a reasonable doubt" standard and permitted the jury to convict Mr. Mensah merely for knowing that "something was amiss." Similar wording was used in earlier cases affirmed by this court. *See Titchell*, 261 F.3d at 351 ("deliberate disregard of the truth"); *Caminos*, 770 F.2d at 366 ("high probability that he knew something was amiss").

15

knowing participation in the conspiracy. The jury instructions delivered by the District Court clearly and properly directed the jury that knowledge could not be premised on mere stupidity or negligence. Furthermore, the District Court properly focused on the defendants' subjective awareness. We find no basis for rejecting either the propriety of the District Court's instruction of willful blindness or its particular wording in this case.

## II.

Mr. Oppong and Mr. Mensah were sentenced prior to the Supreme Court's decisions in *Booker*, 543 U.S. 220 (2005), and *Blakely v. Washington*, 542 U.S. 296 (2004). Following *Booker*, counsel for Mr. Oppong and Mr. Mensah submitted to this court supplemental letters requesting resentencing. By letter of May 12, 2005, the Government has advised this court that it does not oppose defendants' request that this case be remanded for resentencing in accordance with *Booker*. Mr. Oppong's and Mr. Mensah's sentences will be vacated and remanded for resentencing.[1] *Cf. United States v. Davis*, 407 F.3d 162, 163 (3d Cir. 2005) (holding that *Booker* is applicable to all cases pending on direct review and requires remanding for resentencing).[2]

## III.

_____

[1] Mr. Oppong and Mr. Mensah were sentenced under mandatory Guidelines after receiving sentencing enhancements based on judicially found facts (for example, estimates of drug quantities), constituting constitutional error under *Booker*.

[2] Mr. Oppong's brief, filed before the Supreme Court's decision in *Booker*, argues that his sentence was improperly calculated under the Guidelines for several reasons. In light of the need for resentencing under *Booker*, these arguments are moot.

16

In sum, we will affirm the convictions of Mr. Oppong and Mr. Mensah, but we will vacate their sentences and remand for resentencing.